**UNITED STATES of America,**
**Appellee,**

v.

**John James CONNOLLY, Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**William Carl JEPPESEN, Appellant.**

**Nos. 72–2229, 72–2230.**

United States Court of Appeals,
Ninth Circuit.

April 27, 1973.

Rehearing Denied in No. 72–2229
May 25, 1973.

---

Victor Sherman (argued), Nasatir, Sherman & Hirsch, Beverly Hills, Cal., for appellants.

John Newman, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Crim. Div., Los Angeles, Cal., for appellee.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and EAST,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

John Connolly and William Jeppesen appeal their convictions for distribution and possession of cocaine. The principal issues concern the search of Connolly's automobile and of Jeppesen's home.

With the help of a confidential informant, Agent George Marvosh of the Bureau of Narcotics and Dangerous Drugs met one James Scardino. Scardino took Marvosh to Connolly and was present on February 16, 1972, when Connolly sold Marvosh two ounces of cocaine at a house in Los Angeles. The anonymous informer remained outside, in an automobile, and did not participate in the transaction. The sale on February 16 was the basis of one of the two counts on which Connolly was convicted.

On February 24, 1972, after Agent Marvosh had been negotiating with Connolly to purchase more cocaine, Marvosh obtained a warrant to search the Connolly house. Marvosh hoped to make the second purchase the evening of the twenty-fourth, although it was never established that Connolly was willing to sell to him at that time. Marvosh deployed fellow agents and Los Angeles police officers to keep the Connolly house under surveillance, and coordinated further activities by telephone and radio.

Connolly appeared at his house after midnight. Shortly thereafter, another individual, not known to the agents, drove up to the house, and the two went inside. After about ten minutes, they departed in their separate cars.

A police officer named Charles Sears followed Connolly to a house six or seven miles away. Connolly had previously told Marvosh that the "stash pad" for the cocaine was some two minutes away from his house. Sears saw Connolly start up and come down a flight of stairs, but he did not actually see Connolly enter the house. He later testified that he saw Connolly carrying a paper bag down the stairs.

Agents waiting at the first house arrested Connolly as soon as he returned, parked, and got out of his automobile.

---

* The Honorable William G. East, United States District Judge for the District of Oregon, sitting by designation.

He was empty-handed. The agents immediately entered his car and found a paper bag containing four ounces of cocaine under the front seat. This evidence survived a motion to suppress and formed the basis for the second count on which Connolly was convicted.

After his arrest, Connolly agreed to lead the agents to the house from which he had obtained the cocaine. He took them to what proved to be the Jeppesen house. It was the same house that Officer Sears had seen Connolly visit earlier that evening. At two in the morning, four plainclothes officers "knocked and announced" at the Jeppesen door. After a short delay, Jeppesen looked out a window and asked what was going on. Officer Sears yelled "Police Officers" and flashed his badge, but Jeppesen had already left the window. As Sears approached with his revolver drawn, Jeppesen again put his head outside, but withdrew quickly as Sears yelled, "Police Officers, Freeze, Don't Move!" Meanwhile, the other officers kicked down the front door and entered the house.

The officers arrested Jeppesen and his wife, and made a brief inspection of the premises. They found a non-commercial quantity of marijuana in a bowl on a living-room table. One of the officers requested Jeppesen's permission to search the premises. When Jeppesen's assent was not immediately forthcoming, the officer told Jeppesen that it would be some six to eight hours before the officers could obtain a search warrant and that the Jeppesens would be kept in custody at the house during that time. The Jeppesens finally agreed that the officers could search their home, but when an officer suggested that it would be "better for all concerned" if Jeppesen would tell them where the drugs were, Jeppesen went to a freezer and handed the officers, among other things, a bag containing about 10 ounces of cocaine.

This evidence also survived the motion to suppress, and was the basis of Jeppesen's conviction for possession with intent to distribute. Felony charges against Mrs. Jeppesen were dismissed, and she was found not guilty of possession of marijuana.

We affirm Connolly's convictions, and reverse Jeppesen's.

I

Connolly's sole claim of error on the distribution count relates to the government's refusal to disclose the identity of the informant who led Agent Marvosh to Scardino and waited outside while Connolly sold Marvosh the cocaine on February 16. The government represented that unmasking its informer at that time would have exposed him to serious risk from suspects in other narcotics investigations.

██ To establish the claimed error, Connolly must show that knowledge of the informer's name would have been helpful to his defense or essential to a fair determination of his case. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States v. Kelly, 449 F.2d 329, 330 (9th Cir. 1971). Connolly defended the distribution count by denying that he sold cocaine to Agent Marvosh. He now suggests that the anonymous informer might have supported his story and contradicted that of Marvosh. But Connolly made no timely effort to locate or interview Scardino, who, unlike the informer, had been a witness to the entire transaction and was a major participant in it. Just before trial, Connolly learned that Scardino was a fugitive, and for the first time indicated an interest in having Scardino produced. Connolly's failure to exploit his knowledge of Scardino's identity strongly suggests that he would not have made better use of the informer's name.

In contrast to cases like United States v. Miramon, 443 F.2d 361 (9th Cir. 1971), and Lopez-Hernandez v. United States, 394 F.2d 820 (9th Cir. 1968), the informer's role here was peripheral. As in United States v. Kelly, 449 F.2d at 330, "[t]he informant neither witnessed

the crime nor transacted business with the defendant." Connolly's speculation that the informer might contradict Marvosh falls short of showing that disclosure of the informer's identity was necessary. There was no error in refusing to force the government to disclose the informer's identity.

## II

The second count on which Connolly was convicted was founded on the evidence taken from Connolly's automobile after his arrest. This seizure can survive constitutional scrutiny only if (1) the agents had probable cause before the search to believe that Connolly's automobile contained contraband; and (2) the search falls within one of the "specifically established and well-defined exceptions" to the rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable * * *." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

■ When the agents entered Connolly's automobile, they knew: Connolly probably anticipated selling cocaine to Marvosh that night; Connolly had driven to a house several miles from where he conducted his last sale to Marvosh, and had promptly returned with a paper bag; Connolly kept his supply of cocaine at a place apart from his sales location.

Seeing a narcotics suspect go to a nearby residence and leave with a paper bag of unknown contents should make law enforcement officers curious, but curiosity does not equal probable cause to believe that narcotics are in transit. Cf. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Here, however, the negotiations between Connolly and Marvosh for a sale, plus a recent sale by Connolly to Marvosh, gave the conduct observed by the officers significance amounting to probable cause. Although the perennial problem of line drawing is not easily solved, a reasonable officer on the facts of this case

would have probable cause to believe that Connolly had narcotics with him when he drove back to the house from which he conducted his narcotics sales.

The second question generated by the search of Connolly's automobile is whether the agents, with probable cause to believe that the automobile contained cocaine, should have procured a warrant before entering the automobile. The arrest did not take place until after Connolly had shut the car door and stepped away from it. Once arrested, Connolly had no opportunity to gain possession of a weapon or to destroy any evidence that might be in the car. Thus, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), precludes a claim that the search was incident to the arrest, and the government does not argue otherwise.

■ Rather, the government contends that the warrantless search was justified either under the "automobile exception" established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and extended in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), or under the federal forfeiture statutes, 49 U.S.C. §§ 781–782. The Carroll exception, as explained in Chambers, applies when an automobile is stopped on the highway and there is probable cause to search for contraband. A warrant need not be obtained then because "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." 399 U.S. at 51, 90 S.Ct. at 1981. Thus, Carroll justifies a contraband search only "where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Carroll v. United States, 267 U.S. at 153, 45 S.Ct. at 285.

In short, the "automobile exception" must be applied realistically. Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971), illustrates the factors which must be examined before the "automobile exception"

label can be affixed. In *Coolidge,* the state attempted to invoke the exception to justify a search made with probable cause but without a valid warrant shortly after a valid arrest. A plurality of the Court held that the "automobile exception" was "simply irrelevant," 403 U.S. at 462, 91 S.Ct. 2022, and emphasized the following facts: the suspect had known he was under investigation for murder and had had ample opportunity to destroy evidence before the search; during his arrest, the suspect could not gain access to the automobile; the vehicle was parked in a driveway and not in such a place or manner as to attract undue attention; the search did not involve contraband, stolen goods, or weapons; and there were no known confederates likely to remove the evidence.

Recent decisions in this circuit have looked to similar considerations. In United States v. Ellison, 469 F.2d 413 (9th Cir. 1972), we held a car search valid under *Coolidge* and *Chambers* where other persons remaining with the automobile could have removed stolen property hidden in the car. In United States v. Cohn, 472 F.2d 290 (9th Cir. 1973), a brick of marijuana in plain view was further identifiable by a strong odor coming through the car's half-open window. In United States v. Beasley, 476 F.2d 164 (9th Cir. 1973), the car was stopped on a busy highway. On the other hand, in United States v. Payne, 429 F.2d 169 (9th Cir. 1970), we held that a warrantless search of an automobile parked in a park campsite violated the Fourth Amendment where there was no indication that the persons using the car were preparing to leave.

However, the reasonableness of the search of Connolly's automobile is not clearly defined by any of these precedents. Unlike *Coolidge,* Connolly was observed driving his car immediately prior to his arrest; he did not realize that he was under investigation; and he was believed to be transporting contraband. These facts, however, have little relation to the practicality of seeking a warrant after the suspect is safely arrested. For the automobile exception to apply, the government must show that at the time of the warrantless search the officers had reason to believe that the mobility or exposure of the car made it impracticable to seek a warrant. With this principle in mind, it matters little that Connolly parked on a public street rather than in a private driveway as was the case in *Coolidge.* Instead, the decisive difference between Connolly's search and those in *Coolidge* and *Payne* is that the agents here had specific reason to believe that someone who might move the car or take the contraband was awaiting Connolly's return. As Connolly left to obtain the cocaine from the Jeppesen property, he was heard to tell the person who had entered the house with him a few minutes earlier that he would be back in about twenty minutes. The agents attempted to follow this individual, but lost sight of him on the freeway. Not knowing where this person might be, but concerned that he might attempt to contact Connolly at any minute, the agents were justified in searching the car then and there. *Coolidge* forbids such intrusions if founded merely on a generalized fear that an unknown person will move the vehicle or destroy evidence in it; but where the police have and can articulate specific grounds for believing that a known accomplice, acquaintance, or, in unusual cases such as United States v. Cohn, *supra,* an unknown person passing by is likely to move the vehicle or destroy evidence within it before a warrant could be secured, a warrantless probable-cause search is permissible. Under *Chambers,* the police are not required to post a guard around the car in such circumstances. *See* 399 U.S. at 52, 90 S.Ct. 1975.

In view of our conclusion that the search of Connolly's automobile is sustainable under the Carroll line of cases, we need not consider in detail the government's alternate justification. We do not decide whether the search can be supported by the federal forfeiture stat-

utes alone. The serious constitutional question inherent in the proposition that Congress may dispense with the warrant requirement of the Fourth Amendment merely because the object of the search is contraband should await a case in which the decision is necessary.

### III

The last question is whether the evidence against Jeppesen should have been excluded. This question has two main parts: first, whether the agents had probable cause to enter Jeppesen's home to arrest him or search the premises; and, second, whether, if there was such probable cause, an arrest or search warrant should have been obtained. Peripheral questions relate to the forcible entry and the consent to search said to have been given by the Jeppesens.

■ At the outset, the agents lacked probable cause to arrest the Jeppesens when they forced entry. The agents knew that cocaine had been taken from the Jeppesen premises not long before they arrived, but they did not know who might be inside the house, how long such persons might have been there, or what relationship these individuals might have to Connolly. All the agents knew was that some contraband probably remained on the premises

■ Even certain knowledge that contraband is within a dwelling does not constitute probable cause to arrest whoever happens to be inside. *See* Johnson v. United States, 333 U.S. 10, 15–17, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ The intrusion into the Jeppesen house fares no better if it is seen as an entry to search rather than to arrest. "Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant." Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). To hold otherwise would be to say, paradoxically, that when police have probable cause for a warrant they need not obtain a warrant. The agents violated the Fourth Amendment by entering the dwelling. *See* Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L. Ed.2d 828 (1961) (knowledge of "whisky mash" within house); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (knowledge of gambling within rooming house), questioned on other grounds, United States v. Conrad, 448 F.2d 271, 276 (9th Cir. 1971); Johnson v. United States, *supra* (knowledge of narcotics in hotel room); Eng Fung Jem v. United States, 281 F. 2d 803 (9th Cir. 1960) (knowledge of narcotics in hotel room).

■ Since the warrantless entry into the Jeppesen home was illegal for the reasons stated, it is unnecessary to consider whether the manner in which the early morning raid was conducted was constitutionally repugnant and whether Jeppesen freely and voluntarily led the agents to the cocaine in the freezer. The evidence against him was the fruit of an illegal arrest and was inadmissible under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963).

Case No. 72–2229 is affirmed, and case No. 72–2230 is reversed.