UNITED STATES of America, Appellee,

v.

**Fred Leroy GARDNER, Appellant.**

No. 79–1394.

United States Court of Appeals,
Ninth Circuit.

July 23, 1980.

Edward E. Houseman, San Francisco, Cal., argued, for appellant; Robert A. Dorne, San Francisco, Cal., on brief.

Sanford Svetcov, San Francisco, Cal., for appellee.

Before CHOY, KENNEDY and ANDERSON, Circuit Judges.

KENNEDY, Circuit Judge:

Appellant Fred Gardner was convicted of distributing and conspiring to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. On a previous appeal from the district court's denial of his suppression motion, this court remanded for a post-conviction hearing. The district court found that the search of Gardner's residence conducted by the police officers following his arrest did not violate the fourth amendment. We affirm.

A brief description of Gardner's residence is essential to our resolution of this appeal. The residence, located on College Avenue in San Francisco, has three levels. The first level is a garage. The second, or primary, level contains most of the living areas. The third level, the upstairs, contains bedrooms and a bathroom. Entrance to the primary level is by a few stairs leading up from College Avenue. At the rear of the primary level is a back door from the kitchen which leads to some stairs from which one can reach the backyard and the garage. On the street level a door opens from the garage to the sidewalk, so a person can enter the garage from College Avenue, proceed to the backyard, and enter the rear of the residence through the kitchen door. One who observes the residence from the street can watch both the front stairs and the garage door from the same vantage point. The backyard of the house is approximately 70 feet deep and is enclosed on all sides by a fence. The backyard is further obscured by dense undergrowth about six feet high. The residence is a row-type home, attached on either side to adjoining houses.

On July 14, 1977, at approximately 10:30 a. m., three DEA agents posing as prospective drug purchasers were at the Gardner residence. Agents Yaniello and McKulskey arrived together and agent Krusko joined

them. The proposed transactions were the purchase of five pounds of methamphetamine from Gardner and others, including a defendant not before us on this appeal. Also present was a confederate of Gardner's known only as "John."

During the period here relevant, the premises were under surveillance by approximately eleven law enforcement officials. Soon after they arrived, all of the participants in the transaction except McKulskey entered the residence. An argument arose over details of the sale and John walked from the living room to the kitchen; Krusko followed, but John had disappeared, apparently having walked out the back door of the kitchen and down the stairs. Yaniello and Krusko saw John walking down College Avenue away from the house. The surveillance agents outside the house discovered that John had left the premises only when they saw him at some distance from the residence walking down College Avenue. At this time Yaniello, professing fear of a robbery, insisted that appellant permit him to search the entire house for persons in hiding. He walked through the residence and looked into all the rooms, observing certain items of contraband at that time. Yaniello found no one in any of the rooms.

After a number of telephone conversations, appellant left the house to procure two pounds of methamphetamine. He was gone for about an hour. About five minutes before he returned, the DEA agents left the house and stood in front of it on the sidewalk. Except for the five minutes immediately preceding appellant's return, either Krusko or Yaniello remained inside the house.

When appellant returned, he and the DEA agents reentered the house briefly. Appellant and Yaniello then left the house and walked to the undercover car parked nearby, where appellant was arrested. A codefendant was simultaneously arrested by Krusko in the living room of the house.

One of the surveilling agents was admitted to the house by Krusko immediately after Gardner and his codefendant were

arrested. The agent began a protective sweep search by proceeding to the upper level of the house, where he was shortly joined by Krusko. The agents looked into each of the rooms and closets to identify any individual who might pose some danger to the officers. The agents did not engage in general rummaging and did not open any dresser drawers. During the course of this search, the agents observed several items of evidence which were seized and subsequently admitted at appellant's trial.[1]

The appellant sought to have the seized evidence suppressed on the theory that the sweep search violated the fourth amendment, *see Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Government contended that the search was permissible under a "protective sweep" exception to the *Chimel* rule. On remand, after survey into the case law from this circuit and other circuits, the district court found in relevant part:

> Although the matter is not free from doubt, . . . we believe that the facts in this case support the propriety of the search conducted here and the items seized pursuant thereto.

> The floor plan of Gardner's residence, together with the fact that the backyard thereof was entirely enclosed and obscured from street view by reason of its location and undergrowth, made it quite possible for someone to enter the residence from the back undetected by the surveillance personnel stationed in front of the house and to thereafter secrete themselves in the residence. That such ingress was more than post hoc speculation is supported by the fact that one "John," although involved with the transaction which is the subject of this prosecution, was in fact able to leave the residence undetected.

> The belief on the part of the searching agents that there was a potential danger was a real one, for the undercover agents had previously seen at least one of the guns inside the Gardner residence.

Assuming that the district court applied the correct legal standard, its findings concerning whether the exigencies faced by the agents justified the protective sweep search can be reversed only if they are clearly erroneous. *See United States v. Dugger*, 603 F.2d 97 (9th Cir. 1979); *United States v. Flickinger*, 573 F.2d 1349, 1356–57 (9th Cir. 1978). *See also United States v. Williams*, 630 F.2d 1322 (9th Cir. 1978).

Warrantless searches are permitted only in a few circumstances. *See generally Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Emens*, Nos. 78–2722/3153 (9th Cir. April 14, 1980); *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979). Where the Government does not meet the warrant requirement, it has the burden of proving that the departure from this requirement was justified. *United States v. Emens, supra; United States v. Hoffman*, 607 F.2d 280, 282 (9th Cir. 1979); *United States v. Dugger*, 603 F.2d 97, 99 (9th Cir. 1979). *See also Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969). One such justification is the so-called exigent circumstances exception. As the court stated in *United States v. Robertson, supra*, 606 F.2d at 859:

> Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for the search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement.

When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there

---

1. The contraband included 130 marijuana plants in an upstairs bedroom, six kilos of marijuana in large plastic bags, two handguns, some cocaine found in a downstairs study, more bags of marijuana found in the garage, and a brass scale tray.

might be other persons on the premises who could pose some danger to them.[2] The protective search doctrine has been recognized and applied in numerous cases in this circuit. *See United States v. Spanier*, 597 F.2d 139 (9th Cir. 1977); *United States v. Blalock*, 578 F.2d 245, 248 n.1 (9th Cir. 1978); *United States v. Fulton*, 549 F.2d 1325, 1327 (9th Cir. 1977); *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976); *United States v. Hobson*, 519 F.2d 765 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975); *United States v. Curran*, 498 F.2d 30 (9th Cir. 1974); *United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974). *See also United States v. Grummel*, 542 F.2d 789 (9th Cir. 1976), *cert. denied*, 429 U.S. 1051, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977) (search to prevent destruction of evidence).[3]

■ *Chimel* holds that police officers may not as a matter of routine departmental practice search a residence whenever a person is arrested inside the premises. *See, e. g., United States v. Bravo*, 403 F.Supp. 297, 303 (S.D.N.Y.1975). *Compare United States v. Broomfield*, 336 F.Supp. 179, 181, 184 (E.D.Mich.1972). In this circuit, the Government must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion." *United States v. Dug-*

*ger, supra*, 603 F.2d at 99, *quoting Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (striking down warrantless entry and search because no facts reasonably supporting finding of emergency situation). *See also United States v. Hoffman, supra*, 607 F.2d at 283–84 ("The Government does not satisfy [its] burden by leading a court to speculate about what 'may' or 'might' have been the circumstances surrounding the warrantless search."). *Cf.* Kelder & Statman, *supra*, 30 Syracuse L.Rev. at 1021–22 (recommending *Terry* standard for evaluating existence of exigent circumstances justifying search of residence). In *United States v. Flickinger*, 573 F.2d 1349 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), for example, which dealt with the propriety of a warrantless entry into the defendant's house to arrest him, this court found insufficient exigent circumstances in the fact that the occupants of the house might attempt to escape before a warrant could be obtained, where police surveillance gave no indication that the residents were awake. *Id.* at 1355. The court did, however, affirm as not clearly erroneous the district court's finding of exigent circumstances based on the possibility that because of the prior arrest of two confederates, the occupants might have been warned by a telephone call of impending police action. *Id.* at 1355–56. *See also Hobson, supra* (residence known to harbor prison revolutionaries who had threatened violence); *Fulton, supra* (rea-

---

**2.** In determining whether Gardner's fourth amendment rights were violated, we do not think it is a controlling fact that Gardner was arrested just outside his premises while his codefendant was arrested inside, instead of Gardner and his confederate both being arrested inside Gardner's residence.

**3.** The circumstances under which a protective search of a residence may be conducted are not yet completely settled, *see* Kelder & Statman, *The Protective Sweep Doctrine*, 30 Syracuse L.Rev. 973 (1979). Although a finding of exigent circumstances turns on the facts of each case, the different circuits appear to apply the standards for evaluating the constitutionality of such searches in somewhat different ways. *Compare, e. g., United States v. Carter*, 522 F.2d 666, 675–76 (D.C. Cir. 1975); *and United*

*States v. Gamble*, 473 F.2d 1274 (7th Cir. 1973) (protective search held unconstitutional), *with United States v. Cepulonis*, 530 F.2d 238, 242–44 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); *United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Cravero*, 545 F.2d 406, 417–18 (5th Cir. 1977); *United States v. Looney*, 481 F.2d 31 (5th Cir.), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 476 (1973); *United States v. Rich*, 518 F.2d 980, 986 (8th Cir. 1975), *cert. denied*, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976); *United States v. Briddle*, 436 F.2d 4, 6–7 (8th Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971) (protective searches upheld on somewhat broader grounds).

sonable belief that accomplice might be in motel room destroying evidence supported warrantless entry and search); *Mulligan, supra* (movement of defendant towards nearby closet, ostensibly to pick up clothes, justified reasonable belief that accomplice might be in closet); *United States v. Oaxaca*, 569 F.2d 518 (9th Cir. 1978).

■ In this case agent Yaniello had seen weapons in the initial search of the premises and it was therefore both reasonable and prudent for him to conclude that the potential for violence was present here. For at least five minutes preceding Gardner's return, both agents were outside the house on the front sidewalk. The agents inside the house had seen John disappear through the kitchen and reappear some distance from the house on the street.[4] We need not imply that John's disappearance was mysterious to recognize the officers' concern about the ability of a person to enter and leave the house through the garage door without being noticed. The district court found that someone could enter the house, unseen by a surveillance team, by climbing the fence into the backyard, going through the undergrowth, entering the residence

through the kitchen, and proceeding upstairs. It was quite reasonable for the agents to make the same assumptions.

■ We recognize that the extensive surveillance of Gardner's residence and the relatively brief period of time when both officers were outside of the residence diminish the strength of the officers' reasonable apprehension concerning unknown, possibly dangerous, occupants. The facts in this case are not as compelling as those in some prior cases where protective searches have been upheld. On the other hand, agent Krusko did testify at Gardner's trial that a substantial reason for the search was the officers' belief that other dangerous persons might have entered the residence undetected.[5]

In light of the various circumstances which this circuit has relied on in the past to uphold a search of a residence once the officers are properly inside, "we cannot say that we are left with a 'definite and firm conviction that a mistake has been committed.'" *United States v. Flickinger, supra*, 573 F.2d at 1357, *quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).[6] According-

4. It is simply not clear from the record why the surveillance agents did not see John leave the house.

5. We do not think the fact that Yaniello had previously looked through the house and seen many of the items later seized requires exclusion of the evidence on the ground that the seizures were not "inadvertent." The principal and legitimate purpose of the search, as found by the district court, was to protect the safety of the officers, not to seize evidence already known to exist in another part of the house where there was no excuse for the failure to obtain a warrant. *See United States v. Blalock*, 578 F.2d 245, 248–49 (9th Cir. 1978). In any event, Gardner did not raise this issue either at trial or on appeal. *See United States v. Gabriel*, 625 F.2d 830, (9th Cir. 1980); *United States v. Wysong*, 528 F.2d 345, 348 (9th Cir. 1976).

6. None of this circuit's precedents require reversal of the district court's finding regarding the presence of exigent circumstances. In *United States v. Dugger, supra*, the officers, after interviewing the victim of a fight, followed a trail of blood back to the apartment door of the defendant. After knocking and

receiving no answer, the officers used the key in the door to open it. They identified themselves as police officers, and someone from inside the apartment called that he would be right out after he put on his shoes. 603 F.2d at 98. The officers entered and searched the apartment. This court held that the officers' search violated the fourth amendment and reversed the district court's finding of exigent circumstances as clearly erroneous. The officers had no evidence that the defendant was armed, injured, or that any other persons were injured in the fight who might need immediate medical assistance, and the defendant's statement that he would be right out dissipated any emergency which might otherwise have existed. *Id.* at 99–100. The nature of the offense, the circumstances of the arrest, and the probability of others in the residence all distinguish *Dugger* from this case.

In *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), police officers arrested the defendant outside his house. The defendant then turned to the house and yelled, "It's the police." The agents immediately entered and searched the house. The Government argued that the search was appropriate to protect the safety of the officers. This court held that

ly, we hold that the cursory warrantless search of Gardner's residence did not violate his fourth amendment rights, and we therefore affirm his conviction.

AFFIRMED.

there were no exigent circumstances sufficient to justify the search. The court concluded that "[the defendant's] yelling 'It's the police' strikes us as a normal and not unexpected response to his being placed under arrest. It is not unreasonable for an individual to call into his house to his friends or relatives that he is being taken away . . . ." *Id.* at 797. We think *Basurto* is distinguishable. The defendant in *Basurto* was arrested outside his home, and no officers or other participants were known to be inside at the time of the arrest. In this case, by contrast, at least one of the government agents was inside the house at the time of Gardner's arrest, and at least one of Gardner's confederates was known to be inside the house at that time. Here, unlike *Basurto*, weapons were known to be in the house and easily accessible. Also, unlike *Basurto*, the district court could and did properly find that the officers faced a potential danger from others who could have entered the defendant's house undetected. Finally, subsequent cases in this circuit suggest that the existence of exigent circumstances in the protective search context should be judged under the standards of *Terry v. Ohio. See, e. g., United States v. Dugger, supra.* The court in *Basurto* did not appear to evaluate the district court's findings under those standards.

While the Supreme Court's decision in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), reaffirms the especially strong expectation of privacy a person enjoys in his or her home, the reasoning in that case does not require a different result here. The Court explicitly stated that it "[had] no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." *Id.* at 583, 100 S.Ct. at 1378. *See also id.* at 577, 100 S.Ct. at 1375 n.5. In passing, the Court also noted that when effecting an arrest inside the home, "the police may need to check the entire premises for safety reasons."