**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Jozsef Tibor WIGA, Defendant-Appellee.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jozsef Tibor WIGA, Defendant-Appellant.**

**Nos. 80–1635, 80–1724.**

United States Court of Appeals,
Ninth Circuit.

Argued April 6, 1981.

Submitted Aug. 14, 1981.

Decided Dec. 7, 1981.

■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

Sidney M. Glazer, Washington, D. C., argued, for the U. S.; Ruth Cohen, Asst. U. S. Atty., Las Vegas, Nev., on brief.

Randall Roske, Las Vegas, Nev., for Wiga.

Before ANDERSON and NELSON, Circuit Judges, and MURPHY,* Senior District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Jozsef Tibor Wiga was convicted in district court of two counts of violating 18 U.S.C. § 922(g)(1) (felon transporting firearm in interstate commerce), and two counts of violating 18 U.S.C. App. § 1202(a)(1) (ex-felon in possession of firearm). The district court vacated Wiga's convictions on three of the four counts, and sentenced Wiga to serve two years in prison on a single count of possession under § 1202(a)(1). In No. 80–1635, the government appeals the vacating of the three additional counts. In No. 80–1724, Wiga appeals his conviction, claiming the denial of his motion to suppress the two firearms which formed the basis of his conviction was erroneous. We affirm the conviction and the denial of the motion to suppress in No. 80–1724. We reverse the district court's dismissal of Count II for a separate violation of 18 U.S.C. Appendix § 1202(a)(1) in No. 80–1635.

---

* The Honorable Thomas F. Murphy, Senior United States District Judge, Southern District of New York, sitting by designation.

## I. BACKGROUND

On December 21, 1978, Special Agents Charles Barry and Kenneth T'Kindt of the FBI in Nevada received word from the FBI office in Spokane, Washington, that Wiga, a federal parole violator, would be traveling to Las Vegas in the company of one Alice Moody, and that Moody was expected to pick up some money from a particular branch of the Bank of Nevada.[1] The agents went to the branch and arranged for one of the tellers to give a hand signal when Moody arrived. At approximately two o'clock that afternoon, Moody arrived at the bank and transacted her business. The agents observed her walk to a shopping center parking lot, where a motor home bearing Colorado license plates eventually pulled up. The plates indicated issuance of a vehicle license to a handicapped owner. The officers knew Wiga was not handicapped.

After following the motor home for roughly 15 minutes, Barry pulled alongside in an attempt to identify the driver. Barry determined that the driver closely resembled Wiga. At about the time that Barry pulled alongside, the driver pulled down the left-hand sun screen in what Barry surmised was an attempt to hide his face. Barry then pulled the motor home over to the side of the road. Barry and T'Kindt, after identifying themselves, ordered the driver to step out. They concluded upon closer inspection that the driver indeed was Wiga.

After arresting and handcuffing Wiga, Barry asked if anyone else was in the motor home. Wiga replied that no one else was inside, a statement the agents knew was untrue because they had seen Moody enter earlier. T'Kindt called for Moody to come out, which she did via the rear door.

Moody had not been visible to the agents since she had entered.

After Moody complied, T'Kindt entered the rear door of the motor home to see if any confederates of Wiga might still be inside. T'Kindt briefly walked toward the front of the 20-foot vehicle, checking both the bathroom and the closet for possible occupants. As he neared the front, he noticed lying on the floor to the rear of the driver's seat a .357 magnum revolver, and also saw a shotgun in an overhead bunk section above the driver's compartment. He took custody of both weapons, each of which was loaded.

Wiga moved to suppress the weapons on fourth amendment grounds in a pretrial motion. The district court denied the motion and upheld the search of the motor home as a valid search of a vehicle contemporaneous with the arrest of the operator, the weapons being in plain view. Wiga renewed the motion at trial, where it was again denied. This appeal followed.

## II. DISCUSSION

### A. No. 80–1724

Wiga does not dispute the validity of the initial stop of the motor home, nor does he argue that his arrest was improper. He does attack Agent T'Kindt's search of the motor home after Moody had stepped outside as being unreasonable. The government does not contend that Agent T'Kindt had probable cause to search for weapons or contraband, but instead justifies his inspection of the interior of the motor home as a search incident to arrest, and also invokes the "automobile exception" and "plain view" doctrines. In addition, the government has cited our recent decision in *United States v. Gardner*, 627 F.2d 906 (9th Cir. 1980), which we take as an argument that the "protective sweep" doctrine applies in

---

1. The government asserts in its brief in No. 80-1724 that Agents Barry and T'Kindt also received information that Wiga was "armed and dangerous." This assertion finds no support in the record transmitted on appeal, other than the bare assertions which appear in the government's brief in response to the motion to suppress. We do not, therefore, give any consideration to the claim that the agents knew Wiga to be armed.

this case. Upon resubmission,[2] the government now also asserts that *New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) controls.

### 1. The Automobile Exception

■ We recently held that the "automobile exception" is inapplicable to a motor home. *See United States v. Williams*, 630 F.2d 1322 (9th Cir. 1980). In *Williams*, we noted certain differences between a motor home and more conventional street vehicles:

> "Whatever expectations of privacy those travelling in an ordinary car have, those travelling in a motor home have expectations that are significantly greater. People typically do not remain in an auto unless it is going somewhere. The same is not true of a motor home, in which people can actually live. In the ordinary motor home, the glass is tinted or shades can be drawn so that passers-by cannot peer in. Moreover, many, like the one in this case, have beds and fully equipped baths, making them in some senses more akin to a house than a car. In light of both these factors, we cannot uphold this search merely because it was of a search of a motor home...." (Citations omitted)

630 F.2d at 1326.

■ The motor home which Wiga was driving appears to be substantially similar to the vehicle considered in *Williams*. The agents testified that the rear of the Wiga motor home was completely shielded from their view so that Moody was not visible until she stepped outside under their orders. Wiga pulled down a sun screen which effectively blocked his face from Agent Barry's view prior to the vehicle being pulled over.

Agent T'Kindt testified that the vehicle contained both a closed bathroom and a closet. Under the authority of *Williams*, therefore, we cannot sanction the search at issue here merely on the basis of the "automobile exception."[3]

### 2. Protective Sweep Incident to Arrest

■ While a motor home may afford its occupants a higher expectation of privacy than does an ordinary passenger automobile, it also raises the possibility of certain exigencies which are not present in the case of the ordinary automobile stop. A motor home may shield from the view of officers unknown occupants who could either present a threat to the officers' safety or destroy or secrete contraband while the driver is being interrogated. In that sense, a motor home is very much akin to a private dwelling. Therefore, search and seizure doctrines normally applicable to a stationary dwelling or business may in some instances also be applicable to a motor home.

The government invokes one such doctrine here. In *United States v. Gardner*, 627 F.2d 906 (9th Cir. 1980), we had occasion to comment extensively upon what is known in this circuit as the "protective sweep" doctrine. In *Gardner*, we stated the doctrine thusly:

> "When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." (Footnote omitted.)

627 F.2d at 909, 910.

In *Gardner*, officers posing as drug purchasers had observed certain items of con-

---

**2.** This appeal was temporarily withdrawn from submission for purposes of additional briefing by the parties of the effect, if any, of *New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), and *Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), on the instant case.

**3.** This determination does not contradict our disposition in this case that the agents' actions

constituted a valid warrantless sweep search incident to the lawful arrest of an occupant of a motor vehicle. The search incident to arrest doctrine is founded on the notion that "the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *New York v. Belton*, —— U.S. ——, ——, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981).

traband and dangerous weapons in plain view within the residence of Gardner. Even though the residence had remained under surveillance from the outside, it was constructed in such a manner that a person could enter or exit undetected, and the agents were aware that at least one person had departed during their surveillance without being seen. When Gardner returned from a trip to purchase methamphetamine, he was arrested on the sidewalk outside of the residence, while a codefendant was arrested inside the residence. The arresting officers immediately engaged in a "protective sweep" of the residence to determine whether any other occupants remained. We there held that the agents could reasonably assume that other persons might have entered the premises undetected, and that weapons which had earlier been observed could be used. Applying the standards of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we held that the officers in *Gardner* had reasonable cause to suspect that other potentially dangerous persons might be on the premises.

The "reasonable cause" element of *Gardner* is not susceptible of clear definition. Under the analogous *Terry v. Ohio* standard:

"... [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger ... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience...." (citations omitted)

392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Pre-*Gardner* decisions in our circuit which have upheld warrantless premises searches under the rationale of assuring officer safety have generally arisen in the context of circumstances wherein suspicion of the presence of others could rationally be based upon something more concrete than the mere physical capacity of a structure to harbor unseen occupants. *See United States v. Blalock*, 578 F.2d 245 (9th Cir. 1978) (search behind counter of auto shop during business hours); *United States v. Hobson*, 519 F.2d 765 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975) (weapons known to be in residence where others were likely to be staying); *cf. United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974) (brief inspection of closet toward which the arrestee had made two "sudden" moves). Somewhat analogous are decisions which have upheld the right of officers to check for individuals who might destroy evidence. *See United States v. Spanier*, 597 F.2d 139 (9th Cir. 1977); *United States v. Fulton*, 549 F.2d 1325 (9th Cir. 1977); *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976); *United States v. Curran*, 498 F.2d 30 (9th Cir. 1974).

In *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), we held that a protective search was unreasonable where the only indication of potential harm to the arresting officers was that the arrestee, while being placed in custody in front of his house, turned toward the house and yelled, "It's the police." While the vitality of *Basurto* has been drawn at least partially into question after *Gardner, see* 627 F.2d at 911, 912, n.6, it nonetheless is consistent with the premise that bare suspicion unsupported by articulable facts will not justify a protective search.

While nearly all of our fellow circuits have endorsed the principle of a protective search in one form or another, there is considerable disagreement over the degree of reasonable suspicion necessary to justify a sweep of the premises. Some decisions appear to require a fairly detailed showing of reasonable suspicion. *E. g., United States v. Carter*, 173 U.S.App.D.C. 54, 522 F.2d 666 (1975); *United States v. Gamble*,

473 F.2d 1274 (7th Cir. 1973). Others appear to be more sympathetic to the suspicions of the arresting officers. *E. g., United States v. Bowdach*, 561 F.2d 1160 (5th Cir. 1977).

Striking a proper balance in this area is particularly difficult, and overstatement is particularly inappropriate. The Supreme Court has not yet had occasion to address the "protective sweep" concept. An overly-restrictive view of the doctrine might expose arresting officers to unnecessary dangers without providing any greater protection to legitimate Fourth Amendment interests. An overly-deferential attitude toward officers' suspicions, on the other hand, could seriously infringe upon the right to be free from unreasonable searches. We necessarily proceed on a case-by-case basis, keeping in mind the oft-stated presumption that a warrantless search is inherently unreasonable.

Turning to the specific facts of this case, we acknowledge that our inquiry must focus upon the facts that would lead Agents T'Kindt and Barry to form a reasonable suspicion that the motor home housed additional occupants that could impose a threat to the officers' safety. To this end, the government cites several factors that militate in favor of the reasonableness of the search.[4] The agents had not been keeping the motor home under surveillance very long when they pulled it over. They therefore could not determine with any certainty whether other occupants aside from Wiga and Moody were present. After the stop, Wiga lied to the agents when he told them that no one else was present in the motor home. The agents not only knew that Wiga was lying, but their inability to observe Moody from the outside of the motor home confirmed that it was possible for someone to occupy the vehicle without being detected except by an inspection of the interior. Moreover, the vehicle was licensed to a handicapped person, and the agents knew that Wiga was not handicapped. It is not disputed that Agent T'Kindt confined himself to a quick and cursory inspection which could not be characterized as over-broad in light of its purposes.

The record reflects facts and circumstances which would support a reasonable belief that other persons may have been inside the motor home who may have been likely to endanger Agents Barry and T'Kindt. We must conclude, therefore, that the cursory inspection of the motor home was justified by the protective sweep doctrine.[5] Since Agent T'Kindt was performing a legitimate sweep of the motor home incident to the lawful arrest of Wiga, the weapons were lawfully seized since they were discovered in plain view. *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

The district court denied Wiga's motion to suppress and found the warrantless search constitutionally valid as a search incident to Wiga's lawful arrest, citing *United States v. Berryhill*, 445 F.2d 1189 (9th Cir. 1971), with no mention of *Gardner*. In *Berryhill*, the defendant driver of a car and his wife, a front seat passenger, were patted down and his wife's handbag was searched incident to the lawful arrest of *Berryhill* for unlawful possession of the contents of stolen mail. Although the court in *Berryhill* did not apply *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), to the facts of *Berryhill*, because to have done so would have been an impermissible retroactive application of *Chimel* (*see Williams v. United States*, 401 U.S. 646,

---

**4.** The government has also argued that the search was justified in order to prevent destruction of evidence. Wiga, however, was under suspicion of being a parole violator.

**5.** The limited scope of the motor home search that we condone here is one in which the arresting officers have legitimate concerns that occupants not visible to them may imperil their safety. We leave for another day the determination of the constitutional validity of a warrantless sweep search that strays beyond the limited purpose of searching for other occupants.

91 S.Ct. 1148, 28 L.Ed.2d 388 (1971)), the court felt, in any event, that the *Chimel* rule of limiting the scope of searches incident to arrest in a defendant's home was of only slight relevance to the contemporaneous search of a vehicle incident to the arrest of its operator. This court in *Berryhill* concluded:

"[W]hen the driver of a motor vehicle is lawfully arrested in the vehicle, the arresting officer has the right to search the vehicle contemporaneously with and as an incident to the lawful arrest, the vehicle being a thing 'under the accused's immediate control.' *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, [883,] 11 L.Ed.2d 777 (1963)."

*Id.,* 445 F.2d at 1192.

Whether the above sweeping statement in *Berryhill* has survived the years of developing Fourth Amendment jurisprudence may be questionable;[6] however, in light of the Supreme Court's recent determination that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," *New York v. Belton,* —— U.S. ——, ——, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981) (footnotes omitted), the statement from *Berryhill* is now correct to the extent that officers may search the "passenger compartment" of an automobile incident to the arrest of one of its occupants.[7]

Thus, the district court's reliance upon *Berryhill* (at a time prior to the announcement of *Belton* ) is not misplaced in light of

the Court's decision in *Belton,* nor is it contradictory to a finding that the search was a lawful protective sweep incident to an arrest. The justification for the limited sweep of the interior of the motor home in this case is directly related to the same fundamental justifications which dictate the results in both *Berryhill* and *Belton, i. e.,* the preservation of evidence and the discovery of weapons that the arrestee may use to escape or harm the arresting officer.

 In the present case, the officers could justifiably suspect that Wiga and Moody were not the sole occupants of the motor home. While the specific facts have already been discussed above, it deserves reiteration here that officers engaged in the lawful arrest of an operator of a vehicle have a legitimate interest in seeing that the other occupants of a vehicle do not impose any danger to them while executing the arrest of the operator.[8] This court in *Berryhill* said:

"It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."

*Id.,* 445 F.2d at 1193. Occupants of a lawfully detained motor vehicle may be rou-

---

6. Compartments of an automobile, other than the passenger compartment, may not be considered to be within the permissible scope of a warrantless search incident to the arrest of an automobile's occupant. *See Robbins v. California,* ·—— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981).

7. We do not purport to ignore the physical differences between typical passenger automobiles and motor homes, nor do we credit such differences with much weight for purposes of applying *Berryhill* or *Belton* to the facts of this case. Agent T'Kindt's limited search of the

passenger areas of the motor home in the instant case does not stray significantly from the "bright line" rule enunciated in *Belton.* Nor is such reliance upon *Belton* inconsistent with our prior holding in *United States v. Williams,* 630 F.2d 1322 (9th Cir. 1980). *See* n.3, *supra.*

8. Such is also the prudent course of action. *See United States v. Spanier,* 597 F.2d 139 (9th Cir. 1977), and *United States v. Blalock,* 578 F.2d 245, 248, n.1 (9th Cir. 1978).

tinely ordered out of the vehicle, *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), and with reasonable suspicion that the occupants are carrying weapons, arresting officers may lawfully subject such occupants to a pat-down search. *United States v. Berryhill*, 445 F.2d 1189 (9th Cir. 1971); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). It follows that arresting officers should be allowed to initially determine the number and identity of the occupants of a lawfully detained motor home where, as in this case, the enclosed nature of the vehicle prevents the arresting officers from determining how many occupants are traveling in the vehicle, and where the arrested operator, a fugitive felon, lied about the number of his traveling companions. The concern for the arresting officers' safety in this case dictates that the officers be allowed to make the initial determination of the number and identity of all the occupants. Such was the narrow purpose of Agent T'Kindt's sweep of the motor home when he discovered the shotgun and revolver in plain view.

The facts of this case support the district court's determination that Agent T'Kindt's sweep of the motor home was a reasonable search incident to Wiga's arrest.[9] Moreover, the record amply supports the district court's finding that the cursory inspection was the product of the agents' legitimate concern that other occupants may have been concealed within the motor home. We are not inclined to disturb that finding, *United States v. Flickinger*, 573 F.2d 1349, 1357 (9th Cir. 1978), and thus affirm the district court's denial of Wiga's motion to suppress the weapons.

B. *No. 80–1635*

The superseding indictment in this case charged Wiga under two statutes for a total of four counts: Counts I and II, the possession counts, charged Wiga with violations of 18 U.S.C. Appendix § 1202(a)(1),[10] allowing maximum potential sentences of two years per violation; Counts III and IV, the transportation counts, charged Wiga for violations of 18 U.S.C. § 922(g)(1),[11] allowing maximum potential sentences of five years

---

**9.** It should also be noted that additional justification for the district court's denial of Wiga's suppression motion can be found in cases espousing the "inevitable discovery" doctrine. The agents in this case most certainly would have impounded the motor home after the arrest and an inventory would have been conducted. The weapons, in admitted plain view, would have been discovered at one of two points: First, when a driver lawfully entered to drive the vehicle to the impoundment area or, second, during the actual inventory. The most likely is the first since the weapons were in such close proximity to the driver's seat and in plain view.

A number of cases have alluded to the inevitable discovery exception to the exclusionary rule. *See South Dakota v. Opperman*, 428 U.S. 364, 367–76, 96 S.Ct. 3092, 3096–3101, 49 L.Ed.2d 1000 (1976); *United States v. Berryhill*, 445 F.2d 1189 (9th Cir. 1971); *United States v. Jackson*, 448 F.2d 963 (9th Cir. 1971); *United States v. Finnegan*, 568 F.2d 637, 642, n.5 (9th Cir. 1977); *United States v. Schmidt*, 573 F.2d 1057, 1065, n.9 (9th Cir. 1978); *United States v. Brookins*, 614 F.2d 1037, 1044–48 (5th Cir. 1980) (thorough discussion by Judge Vance); *United States v. Leonard*, 630 F.2d 789, 790–91 (10th Cir. 1980).

**10.** 18 U.S.C. App. § 1202(a) provides:

(a) Any person who—

(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

(2) has been discharged from the Armed Forces under dishonorable conditions, or

(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

(4) having been a citizen of the United States has renounced his citizenship, or

(5) being an alien is illegally or unlawfully in the United States,

and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

**11.** 18 U.S.C. § 922(g) provides:

(g) It shall be unlawful for any person—

(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) who is a fugitive from justice;

(3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant

per violation. Counts I and III involved the revolver found incident to Wiga's arrest; Counts II and IV involved the shotgun. Although a verdict of guilty on all four counts was rendered by the jury, the district court sentenced Wiga to two years' imprisonment under Count I only. Counts III and IV were dismissed by the district court in response to Wiga's Rule 29(c) motion for judgment of acquittal on the basis of a multiplicitous indictment.[12] Count II was dismissed by the district court on its own initiative, concluding that "the government may not treat each of several firearms simultaneously possessed as a separate unit of prosecution under 18 U.S.C. Appendix § 1202(a)(1)."

While the government concedes that Wiga cannot be convicted simultaneously for both transportation and possession of the same firearms, and that Wiga cannot be convicted and sentenced for simultaneous transportation of multiple weapons,[13] it now argues for reinstatement of various alternative combinations of counts on three theories: (1) that the district court should have sentenced Wiga for a § 1202(a) possession violation involving one firearm and a § 922(g) transportation violation as to the other for a potential consecutive sentence of seven years; (2) alternatively, that the district court should reinstate a single § 922(g) transportation count in lieu of the court's dismissal of both such counts in favor of a single § 1202(a) possession count for a maximum potential sentence of five years; or (3) alternatively, the district court should reinstate the dismissed § 1202(a) pos-

session count for a potential maximum sentence for two possession counts of four years. We shall discuss each theory in order.

1. *One Possession Count, One Transportation Count*

■ The government argues that, on the basis of the evidence and the jury's verdicts in this case, the district court could have at least sentenced Wiga for transportation of one weapon and possession of the other; thus allowing a possible maximum sentence of seven years—five years for the § 922(g) count (pursuant to the § 924 sentencing provision) and two years under the § 1202(a) count. In support of this contention, the government asserts that *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), dictates that the district court was not required to sentence Wiga only under the more lenient § 1202(a) count, dismissing the potentially longer sentences under § 922(g). In *Batchelder*, the government had indicted the defendant under § 922(h) (receipt by an ex-felon of a firearm that has traveled in interstate commerce), and the defendant argued that the conduct proscribed under § 922(h) was the same conduct proscribed under § 1202(a), thus asserting his right to a lesser sentence under the rule of lenity. The Court held that it was proper for the government, in using its prosecutorial discretion, to charge under either statute and the district court was not required to sentence the defendant under the more lenient

---

drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or

 (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

to ship or transport any firearm or ammunition in interstate or foreign commerce.

**12.** Multiplicity apparently can refer to both constitutional principles prohibiting double jeopardy, *see Baugh v. United States*, 540 F.2d 1245, n.1 (4th Cir. 1976); *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435

(1954), and to principles of statutory construction which determine the legislative intent, *vel non*, to cumulate punishment for constitutionally valid separate offenses arising from a single transaction. *See Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), and *United States v. Clements*, 471 F.2d 1253 (9th Cir. 1972).

**13.** Since the government fails to argue these points, although it contends that there is authority to support what it concedes, we do not consider these contentions.

§ 1202(a) because there was no ambiguity created by the two sections.

Wiga argues that at the most, *Batchelder* allows an indictment under either statute, but not both; and that it does not settle the question as to which charges should be dropped in a multiplicitous indictment. For that proposition, Wiga cites *United States v. Larson*, 625 F.2d 67 (5th Cir. 1980). In *Larson*, the defendant, a previously-convicted felon, was charged under 18 U.S.C. § 922(h)(1) and 18 U.S.C. App. § 1202(a)(1) for unlawfully carrying a single pistol. Larson argued that it was improper to be sentenced under both statutes. The court held that the United States Attorney may not proceed under both statutes and remanded the case to the district court to decide which conviction to vacate, noting that the district court was not compelled to vacate the convictions under § 922(h), carrying the longer sentence maximum.

A case perhaps more on point is *United States v. Girst*, 636 F.2d 316 (D.C.Cir.1979), *modified on rehearing*, 645 F.2d 1014 (D.C. Cir.1979). Girst, like Wiga, was sentenced under both 18 U.S.C. § 922(g)(1) and 18 U.S.C. App. § 1202(a)(1). On the first appeal, the District of Columbia Circuit held that the two statutes proscribed the same conduct and vacated Girst's conviction under § 922, applying the rule of lenity in favor of a shorter sentence under § 1202. Upon rehearing, the court discussed the effect of *United States v. Batchelder, supra*, on the disposition of *Girst*. The court reasoned that *Batchelder* precluded it from applying the rule of lenity since the Supreme Court had decided that the two statutes were not ambiguous. However, the D.C. Circuit read *Batchelder* to also state

that the government may prosecute under either § 922 or § 1202, but not both; therefore, the circuit court remanded the case to the district court to determine, within its discretion, which conviction to vacate.

We agree with the government that the district court was not precluded by law from sentencing Wiga under § 922(g) (pursuant to the sentencing provisions of § 924) for one firearm and § 1202(a) for the other.[14] However, we also agree with the Fifth Circuit in *Larson* and with the D.C. Circuit in *Girst* that if the prosecution fails to elect under which statute to proceed, and if convictions are rendered under both statutes, that the district court may exercise its discretion in deciding which conviction to vacate. As Wiga correctly asserts, *Batchelder* decided only that the prosecution may proceed under either statute. In the instant case, as in *Larson* and *Girst*, the government decided to proceed under both statutes which proscribe essentially the same conduct. In such a case as this, the district court, in its discretion, must solve the multiplicity problem; and toward that end, the district court below concluded that "section 1202(a) is the more appropriate statute." We feel the government's suggestion that it, not the court, now be allowed to choose under which counts the defendant should be sentenced is fundamentally inappropriate. The United States Attorney, as a matter of prosecutorial discretion, may choose under which statute it prefers to proceed, provided it does not discriminate against any class, *United States v. Batchelder, supra*, but if it chooses to proceed under both § 922(g) and § 1202(a), it indicts the defendant twice for essentially the same conduct. In such a

---

14. Wiga argues that the rule of lenity, *see, e. g., Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493; *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), precludes the district court from entering a sentence under § 922(g) because of its higher maximum term for imprisonment. In *Batchelder*, the Court rejected the application of the rule of lenity to convictions under § 922(h), concluding that there was no

ambiguity between § 922(h) and § 1202(a), only different penalties for essentially the same conduct. *United States v. Batchelder*, 442 U.S. 114, 121, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979). We follow the Court and find no ambiguity between § 922(g) and § 1202(a) that requires the application of the rule of lenity. *See also United States v. Girst*, 636 F.2d 316 (D.C. Cir.1979), *modified on rehearing*, 645 F.2d 1014 (D.C.Cir.1979).

case, the government's review in this court of the district court's discretionary dismissal of some charges is limited to a determination of whether the district court abused its discretion. *United States v. Larson, supra,* and *United States v. Girst, supra.* We find no such abuse.

### 2. *One Count Under § 922(g)*

■ The government next argues that even if the district court was correct in dismissing all but one count, it incorrectly chose to sentence Wiga with one violation of § 1202(a) possession, rather than § 922(g) transportation. This argument essentially states the same argument discussed immediately above. The government once again asserts that the district court abused its discretion in dismissing the transportation counts in favor of the possession counts.[15] For the same reasons discussed above, we find no evidence in the record that the district court abused its discretion in dismissing the transportation counts.

### 3. *One Possession Count for Each Weapon*

■ The district court dismissed Count II, the possession count involving the shotgun, because it concluded from its reading of the applicable case law that "the government may not treat each of several firearms simultaneously possessed as a separate unit of prosecution under 18 U.S.C. Appendix § 1202(a)(1)."

The government now alternatively argues that the district court should reinstate Count II because it reads the case law to provide authority for multiple convictions and sentences for simultaneous possession of weapons separately acquired. The government's third contention here presents a different issue from what is presented by its first two arguments. While the first two arguments were premised on principles

of multiplicity involving multiple convictions and sentences under two statutes proscribing essentially the same conduct, the question presented by the government's third argument involves a determination, as a matter of law, of the appropriate unit of prosecution under one statute, § 1202(a)(1), of the simultaneous possession of more than one weapon.

The general rule, as stated in the cases relied upon by the district court below, is that "only one offense is charged under terms of § 1202(a)(1) regardless of the number of firearms involved, absent a showing that the firearms were stored or acquired at different times and places." *United States v. Rosenbarger,* 536 F.2d 715, 721 (6th Cir. 1976); *United States v. Bullock,* 615 F.2d 1082 (5th Cir.), *cert. denied,* 449 U.S. 957, 101 S.Ct. 367, 66 L.Ed.2d 223 (1980); *see also United States v. Calhoun,* 510 F.2d 861 (7th Cir. 1975), and *United States v. Kinsley,* 518 F.2d 665 (8th Cir. 1975). The courts in each case concluded that § 1202(a)(1) was ambiguous as to the appropriate unit of prosecution and, under the principles of lenity expressed in *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), they were compelled to find only one conviction for simultaneous possession of multiple weapons.

While stating the general rule of only one unit of prosecution for simultaneous possession, the district court below apparently overlooked the qualifying exception embodied in the phrase "absent a showing that the firearms were stored or acquired at different times and places." The government argues on appeal that this exception applies to the facts of this case since the evidence demonstrates that Wiga purchased the two weapons at different times and in different places. We agree. Of the cases cited above which state the general rule of only one unit of prosecution for simultaneous possession, the only case to apply the

---

**15.** We disagree with the government that the district court felt "compelled" (presumably as a matter of law) to dismiss the transportation counts. The district court's opinion only suggests that the district court felt, as a matter of discretion, that convictions and sentences under the transportation counts were inappropriate in this case.

exception—finding separate units of prosecution under § 1202(a)(1) for each weapon separately acquired—is *United States v. Bullock, supra.* In the other cases, the courts found only one violation because the facts did not demonstrate separate storage or acquisition. The *Bullock* court (Goldberg, J., dissenting) applied the exception since Bullock had received the weapons at different times and places.

We take our place in line with the other circuits in espousing the rule and its exception as stated in the cases cited above. We also note that Wiga's multiple transgressions dictate an even more compelling set of facts for the application of the exception than was present in *Bullock.* The uncontroverted evidence demonstrates that the revolver was acquired (i. e., received and possessed) in Nebraska on December 18, 1978, and the shotgun was acquired in Iowa on April 14, 1978. The indictments allege the separate and distinct acts of acquisition in Nebraska and Iowa with particularity as to time and place. The jury was correctly and adequately instructed as to the essential elements of each offense in Counts I and II. Further, correct instructions were given defining possession, the interstate commerce requirement and the inferences that might be properly drawn from the uncontroverted sequence of events. Wiga does not quarrel with any of these instructions. The separate and distinct acquisitions were argued to the jury without interference or objection. The mere fact that these separately acquired weapons ended up simultaneously in the possession of Wiga in Nevada does not preclude separate prosecutions for possession.

We believe the court in *Bullock* correctly interpreted the intent of Congress in a statement that deserves reiteration here:

"Common sense and logic, however, will not support a holding that the receipt of firearms at separate times must merge into one possession, thus, one offense. In addressing this evil, could Congress have intended to deter receipt as well as pos-

session of firearms by convicted felons and yet design the statute to only allow one punishment no matter how many separate receipts and possessions occurred? We think not. Any other determination would allow convicted felons and terrorists to establish armories where all of their weapons would be kept. The person in custody of the armory would then be subject to only a single charge of possession, although thousands of illegal and dangerous weapons were received and stockpiled at different times."

615 F.2d at 1085–86.

*4. Conclusion as to 80–1635*

We find that the district court did not abuse its discretion in dismissing Counts III and IV under 18 U.S.C. § 922(g)(1). We find, however, that Wiga was properly convicted of Count II and should have been sentenced for both Counts I and II.

We REVERSE and REMAND as to Count II with directions that the guilty verdict be reinstated and that the defendant be sentenced thereunder.