UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Kent SPETZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Vincent Anthony GULINO,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Max Andrew KALIK,
Defendant-Appellant.

Nos. 80–1331, 80–1334 and 80–1335.

United States Court of Appeals,
Ninth Circuit.

Original Opinion May 13, 1983.
Modified Opinion Dec. 14, 1983.

Gerald M. Birnberg, Houston, Tex., for Spetz.

Philip Deitch, Westwood, Cal., for Gulino.

Richard H. Kirschner, Los Angeles, Cal., for Kalik.

Theresa Kristovich, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before ELY, FLETCHER, and REIN-HARDT, Circuit Judges.

## MODIFIED OPINION

REINHARDT, Circuit Judge:

Appellants Charles Spetz, Vincent Gulino, and Max Kalik were charged with violation of the federal narcotics laws in a five count indictment. Count One charged Spetz, Gulino and Kalik with conspiracy to distribute and to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 (1976). Count Two charged Gulino with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (1976), and Kalik and Spetz with aiding and abetting, in violation of 18 U.S.C. § 2 (1976). Count Three charged Spetz with possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). Count Four charged Kalik with possession of marijuana, in violation of 21 U.S.C. § 844 (1976). Count Five charged Kalik and Spetz with possession of cocaine, in violation of 21 U.S.C. § 844(a) (1976).

Prior to trial, Spetz, Gulino, and Kalik filed various motions to suppress a quantity of marijuana seized in a van pak, marijuana, narcotics, and narcotics paraphernalia seized during the search of a residence, the contents of a briefcase taken during a search of the trunk of Gulino's automobile, and a quantity of marijuana seized in Spetz' Datsun truck. Following a hearing, the district court denied the motions to suppress.

Spetz and Gulino were then tried by the court on the basis of the transcripts of the suppression hearing and additional stipulated facts and testimony. There was no dispute as to the material facts relating to guilt or innocence, although the parties disagree as to their legal significance. Spetz and Gulino were convicted on Counts One and Two, as charged. Spetz was also convicted on Count Three of the lesser included misdemeanor of simple possession. Kalik was tried separately before the court. He was convicted on Counts One and Two and acquitted on Count Four. The district court granted the government's motion to dismiss Count Five with regard to all defendants.

Spetz, Gulino, and Kalik appeal, arguing that the district court erred in denying their motions to suppress. Kalik also charges error in the district court's admission into evidence of a book entitled *Fortune Favors the Brave,* and contends that there was insufficient evidence to support his conviction.

## I.

## BACKGROUND

On December 10, 1979, members of the United States Customs Special Contraband and Narcotics Interdiction Team took two detector dogs and their handlers to the Matson Terminal in the Los Angeles harbor. The dogs were part of the Customs Narcotics Dog Interdiction Force. The terminal handles merchandise for Matson, a shipping company which deals in cargo from Hawaii and Guam, and two Japanese steamship companies. The terminal consists of a

fenced area inside which are berths where ships from the three shipping companies dock, a container yard where container cargo is stored, a container freight station where van paks are stored, company offices, and a customs office where two customs inspectors are permanently stationed.[1]

On December 10th, there were two ships unloading at the terminal, one a Matson vessel, the other a Japanese ship. The customs inspectors entered the container yard and ran the detector dogs within the yard. The dogs mildly alerted on two containers.[2] The customs inspectors noted the container numbers, had a Matson employee run them through a computer, and ascertained that both containers had been transported from Hawaii on the Maunalani, the Matson vessel. The manifest of the Maunalani indicated that one container was to be delivered in full outside of the yard, while the other container was to be devanned[3] and placed in the container freight station in the terminal.

On December 12, the customs inspectors went to the container freight station.[4] They learned that the container that was to be devanned had already been opened and the individual van paks placed in the container freight station. The inspectors received permission to enter the freight station. They first ran "Humphrey," one of the dogs that had been run through the container yard on December 10th, through the station. "Humphrey" alerted on a large van pak.[5] The customs agents then ran "Randy," a second detector dog, through the area. "Randy" alerted on the same van pak.[6]

The agents determined that the van pak had been transported on the Maunalani and was addressed to one Mike Murray, 14540 Round Valley Drive, Sherman Oaks, California. After learning that the customs computer listed a Michael J. Murray as having been convicted of marijuana smuggling, the customs agents called the Drug Enforcement Administration (DEA) and discussed the alert with a DEA agent.[7] Based on the foregoing information, DEA Agent Clifford Loveless prepared an affidavit for a search warrant for the van pak.

When he executed the warrant, Loveless discovered 1440 pounds of marijuana packed in plastic bags inside the van pak. He removed one plastic bag and field tested the contents. The test proved positive. Loveless inserted a beeper, which would trigger if the container were shaken or the beeper wire broken, into the van pak and resealed it.[8]

1. There are approximately fifty terminals at the Los Angeles-Long Beach Harbor. A customs station is located at each terminal.

2. The dogs were named "Humphrey" and "Randy." Agent MacCauley, "Humphrey's" handler, described "Humphrey's" reaction as a mild alert, which consists of lightly biting and scratching the object sniffed. According to MacCauley, the stronger the scent, the more forcefully the dog will attack the object.

An alert indicates the presence of a controlled substance. "A dog can alert to the drug in a variety of ways; the dog can snarl, bark, whine, or paw at a container. Each dog may respond differently." Comment, *United States v. Solis: Have the Government's Supersniffers Come Down with a Case of Constitutional Nasal Congestion?*, 13 San Diego L.Rev. 410, 415 (1976). In fact, as Agent MacCauley says, a dog may even attack the object containing the controlled substance.

3. "Devanning" consists of separating the cargo from the container.

4. The freight station consists of a large shed which houses van paks separated from the containers that held shipments for more than one consignee. Each van pak is marked with the name of the ship on which it is transported.

5. The record reflects that "Humphrey" had previously alerted on 61 occasions, of which five were false alerts.

6. "Randy," a far less experienced dog, had a much less impressive track record. He had previously alerted on six occasions, of which four were false alerts.

7. DEA Agent Clifford Loveless came to the freight station and inspected the exterior of the van pak.

8. The beeper was a Bird Dog 200 transponder. The device beeps once every five seconds until disturbed, at which point it beeps more rapidly.

DEA agents then established surveillance at the terminal. On December 14, John Kelly, driving a Ford truck, and Gulino, driving a Mercedes Benz, arrived at the freight station. Kelly entered the terminal office and took delivery of the van pak, which was loaded into his truck.

Kelly and Gulino left the terminal in their respective vehicles. Kelly parked the truck at one point and walked to the corner. Shortly thereafter, Gulino arrived in the area in his Mercedes, parked and "proceeded to go where Kelly was parked." Kelly and Gulino conferred, returned to their vehicles and then proceeded in tandem to Van Alden Street in Van Nuys, approximately 35 miles from the terminal. After turning onto Van Alden, Gulino parked the Mercedes, placed a briefcase in his trunk, and entered the Ford truck that Kelly was driving. The truck then continued along Van Alden for approximately two miles and turned into a driveway to a residence. The driveway was an eighth to a quarter of a mile long.

Surveillance was established at the Van Alden residence. At 1:00 p.m., approximately one-half hour later, the beeper inside the van pak triggered. Loveless instructed the ten DEA agents present to make arrests. One agent observed the scene from a helicopter, and the remaining DEA agents, in six separate vehicles, proceeded up the driveway. There were five vehicles and five individuals in the driveway. The Ford truck was backed up to the open garage, and a Datsun truck was parked beside it. The van pak was still in the bed of the Ford truck. The agent in the helicopter saw Spetz, who had been standing next to the Ford, run to the Datsun, get in, and drive rapidly away. Spetz's

truck was stopped by other agents before it reached Van Alden Street, and Spetz was arrested and removed from the vehicle. The agents also arrested Kelly,[9] who was in the Ford truck, Gulino, Kalik, and Hugh Rankin,[10] who were standing between the Ford and the house. The side, front, back, and garage doors of the house were open.

Loveless and two other agents entered the house through the open front, side, and back doors, and made a two to three minute room-by-room search for other suspects. While in the house, one agent noticed an envelope with money protruding from it, and Loveless observed what he believed to be small quantities of marijuana, narcotics, and narcotics paraphernalia.

In front of the house near the garage and the Ford and Datsun trucks, Loveless observed a second van pak. It was empty and, like the van pak that was still in the Ford, bore the name Mike Murray. Loveless detected the odor of marijuana emanating from the crate. At some point, another agent looked through a window in the rear of the Datsun and observed a bulging tarpaulin covering the bed of the truck.

With the exception of Spetz, all of the individuals previously arrested were taken to the DEA office that afternoon. Spetz elected to go inside the house to await arrival of the search warrant. Loveless accompanied him into the house, where, in front of Spetz, he counted the money in the envelope. While in the house, Loveless observed a utility bill in plain view on the table.[11] The bill indicated that Kalik lived at the residence.

Meanwhile, two of the DEA agents went to get Gulino's Mercedes. They had previously announced that the Mercedes would be forfeited and obtained the keys from

---

**9.** John B. Kelly was also charged in several counts of the indictment. He was acquitted after a bench trial and is not a party to this appeal. At Kelly's trial, Gulino, who had already been convicted at a separate trial held several days earlier, testified that he had hired Kelly to pick up the van pak in a rented truck, and that Kelly was unaware of the contents of the van pak and the nature of the transaction.

**10.** Rankin was not indicted.

**11.** The appellants repeatedly assert that the utility bill was found during the initial protective sweep of the house. The record is to the contrary, and supports the government's contention that the utility bill was found after the protective sweep, while Loveless waited in the house with Spetz for the search warrant to arrive. The discovery of the utility bill was apparently communicated by telephone to the agents attempting to secure the search warrant and was included in the affidavit.

Gulino. They surveyed the contents of the passenger compartment and the trunk but did not remove anything, and drove the car back to the house.

Several other DEA agents returned to the house with a search warrant at approximately 9:00 p.m. After the search was completed, one of the agents inquired whether Spetz was the registered owner of the Datsun truck. The agent told him the truck was being forfeited and obtained the keys from him. The agent opened the rear of the truck, removed the bulging tarpaulin and found approximately 400 pounds of marijuana wrapped in a manner similar to the marijuana discovered in the van pak at the terminal. The Datsun was then taken to the DEA office.

Agent Loveless removed the briefcase from the trunk of the Mercedes for "safekeeping" until a search warrant could be obtained. The car was taken to the DEA office, and a formal inventory search was made three days later. Thereafter, the briefcase was searched pursuant to a warrant and found to contain documents and approximately $57,000 in cash.

## II.

## THE DECEMBER 12th SEARCH OF THE VAN PAK

Gulino and Kalik challenge the legality of the dog sniffs and the sufficiency of the

affidavit supporting the December 12th warrant to search the van pak.[12] Appellants also claim that misstatements and omissions in the affidavit render the magistrate's determination of probable cause invalid. We find no illegality in the dog sniffs. We uphold the warrant because the information provided was sufficient to support a finding of probable cause. Finally, there has been no showing that the errors in the affidavit were either deliberate or so material that they could have altered the magistrate's probable cause determination.

A. *The Legality of the Dog Sniffs and the Sufficiency of the Affidavit.*

We have held that dog sniffing, at least in the case of personal luggage, constitutes "a Fourth Amendment intrusion." *United States v. Beale,* 674 F.2d 1327, 1335 (9th Cir.1982) (*Beale I*)[12a]. Here, the determining factor is the location in which the sniffing occurred. The container yard through which the dogs were run on December 10th was clearly designated as a customs facility. The customs agents were authorized to run the dogs through the yard because it was a customs area where goods were placed immediately upon their removal from ships arriving from foreign ports.[13] At the time the dogs were run, foreign cargo was in the yard. Once the dogs were

**12.** Although appellants attack the affidavit supporting the opening and search of the van pak, they do not challenge the insertion of the beeper device into the van pak after it was opened by the agents. *See United States v. Brock,* 667 F.2d 1311 (9th Cir.1982) (Sneed, J.); *id.* at 1323 (Adams, J., concurring); *id.* at 1325 (Fletcher, J., concurring), *cert. denied,* —— U.S. ——, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983). *Cf. United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). Thus, the only issue that concerns us here is the opening and search of the van pak.

**12a.** The Supreme Court granted the petition for writ of certiorari filed in *Beale I,* vacated the judgment, and remanded for "further consideration in light of *United States v. Place,* 462 U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)." *United States v. Beale,* —— U.S. ——, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983). On remand, we reaffirmed our decision in *Beale I. United*

*States v. Beale,* 80–1652 (9th Cir. Oct. 24, 1983) (*Beale II*).

**13.** Because "mere entry alone into the United States from a foreign country is sufficient reason" for a search, *Klein v. United States,* 472 F.2d 847, 849 (9th Cir.1973); *see also United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Barusch v. Calvo,* 685 F.2d 1199, 1200–01 (9th Cir.1982); *United States v. Ajlouny,* 629 F.2d 830, 834–35 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. McDaniel,* 463 F.2d 129, 132 (5th Cir.1972); *United States v. Stornini,* 443 F.2d 833, 835 (1st Cir.1971), various statutes and regulations have been held to justify searches of arriving foreign goods or cargo "whether or not there be any suspicion of illegality directed to the particular . . . thing to be searched." *United States v. Odland,* 502 F.2d 148, 151 (7th Cir.), *cert. denied,* 419 U.S. 1088,

in the customs area under proper authority, customs agents could take note of any alerts that they provided. *Cf. Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).[14]

■ The second dog sniff on December 12th can be upheld on a wholly different theory. The first sniff on December 10th gave rise to a " 'founded' or 'articulable' suspicion" that the van pak contained illegal drugs. *Beale I,* 674 F.2d at 1335. Such founded suspicion was sufficient to justify the further dog sniff of the particular cargo. *Id.*

■ A validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant only if sufficient reliability is established by the application for the warrant. *Beale I,* 674 F.2d at 1335 n. 14. On its face, the portion of the affidavit regarding "Humphrey's" alert on December 12th was sufficient to establish probable cause to search the van pak, particularly since the affidavit showed that "Humphrey's" identification was independently corroborated by the alert of another dog.

## B. *Misstatements in the Affidavit.*

■ The mistaken information in the affidavit pertains to the reliability of the dogs that alerted government officials to the contents of the van pak. The affidavit

stated that two dogs, "Humphrey" and "Randy," had independently alerted on the van pak during the December 12th episode in the customs area. "Humphrey" was one of the dogs who mildly alerted on the container on December 10th. Agent Loveless' affidavit stated that, according to the dog handler, "Humphrey" had previously alerted correctly on 60 of 66 occasions, and "Randy" had been correct on 2 of 2 prior alerts. In fact, the records of both dogs were misstated: "Humphrey" had been correct on 56 of 61 occasions, and "Randy" had been correct in only 2 of 6 instances.

We find that the mistake in the affidavit as to "Humphrey's" record was unimportant because the difference in the figures is immaterial and would not have affected the magistrate's judgment of the dog's reliability. Moreover, "Humphrey's" alert was corroborated by the actions of the second dog, "Randy." *Beale I,* 674 F.2d at 1336. Even though "Randy" was neither experienced nor habitually accurate, his alert could still properly be recognized as evidence corroborating the independent alert of a dog with a more reliable record. Thus, the error with respect to "Randy's" reliability is also immaterial.

Because the record contains no suggestion that the misstatements of the records of "Humphrey" and "Randy" were deliberate or in reckless disregard for the truth,[15]

95 S.Ct. 679, 42 L.Ed.2d 680 (1974). *See, e.g.,* 19 U.S.C. §§ 1461, 1467, 1582 (1976); 19 C.F.R. § 162.6 (1982). Thus, the customs officers were authorized to run the dogs through a customs yard containing goods from ships arriving from foreign ports.

**14.** There is no contention here that customs officials improperly classified the area as a customs facility or allowed or caused containers of a domestic origin to be placed in a customs facility as a pretext for conducting a generalized search. *See Barusch,* 685 F.2d at 1200–01; *United States v. Schafer,* 461 F.2d 856, 859 (9th Cir.), *cert. denied,* 409 U.S. 881, 93 S.Ct. 211, 34 L.Ed.2d 136 (1972). Such a tactic, designed "to circumvent legal restrictions on criminal search warrants," would be constitutionally impermissible. *Barusch,* 685 F.2d at 1200.

**15.** The relevant portions of the affidavit state:
3. Inspector Jackson further advised me that he was advised by Customs Dog Handler

James McCauley that his dog, "Humphrey," (C–148) alerted positively for the presence of narcotics on a wooden crate, called a "van pak." Dog Handler McCauley also advised Jackson that his dog "Humphrey" has correctly alerted on 60 out of 66 occasions for the presence of narcotics. These instances were verified by searches conducted subsequent to the alert by "Humphrey."
4. I was also advised by Inspector Jackson this date that Customs Dog Handler Michael Fitzgerald and his dog "Randy" (C–149) were brought in following the alert by "Humphrey" and the same van pak was checked. The check by "Randy" was again positive for the presence of narcotics in the wooden van pak. Inspector Jackson was advised by Dog Handler Fitzgerald that "Randy" had correctly alerted on two out of two occasions while at the harbor.
The context of these statements concerning reliability suggests that the errors were due to

we conclude that the December 12th warrant to search the van pak was valid. *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).[16]

## III.

## SEARCH OF THE VAN ALDEN RESIDENCE

### A. *Protective Sweep*

Following the arrest of the five suspects in the driveway of the Van Alden residence, several DEA agents entered the house to search for additional suspects. In the course of this protective sweep, they observed *inter alia* a set of scales, approximately $10,000 in currency, marijuana, narcotics, and narcotics paraphernalia. These observations are reflected in the affidavits supporting issuance of a warrant for a subsequent search of the Van Alden residence.[17] Kalik and Spetz contend that the protective sweep was unlawful and that the evidence produced by the subsequent search pursuant to the warrant must be suppressed because the warrant was based in part upon the observations made during the earlier warrantless entry.

At the close of the evidentiary hearing on the motions to suppress, the district court first ruled that there were exigent circumstances that justified the protective sweep. In the alternative, the court ruled that there was probable cause to support issuance of a search warrant for the house even in the absence of the observations made by the customs officials in the course of the protective sweep.

■ We begin our analysis with the fundamental precept that a warrantless search of a residence is "presumptively unreasonable" under the fourth amendment. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). These exceptions are to be " 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge,* 403 U.S. at 455, 91 S.Ct. at 2032 (footnotes omitted).

■ The exigent circumstances exception to the warrant requirement applies in some instances when law enforcement officers arrest an individual in or near a residence.

When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them.

*United States v. Gardner,* 627 F.2d 906, 909–10 (9th Cir.1980) (footnote omitted). The government bears a heavy burden of demonstrating that exceptional circumstances justified the departure from the normal procedure of obtaining a warrant.

---

mistakes in relating hearsay information rather than the result of intentional falsification.

**16.** The omission of information concerning the first dog sniff on December 10th was not harmful to appellants. On the contrary, the mild alerts of the two dogs, including "Humphrey," would have further corroborated the information already provided in the affidavit. Thus, inclusion of this information would not have altered the magistrate's probable cause determination.

Appellants also argue that the portion of the affidavit stating that Michael Murray had been arrested by customs agents in Miami in 1973 for alleged smuggling of marijuana was entitled to no weight. The issue is immaterial because the affidavit provided probable cause to search even without the paragraph relating to Murray's arrest.

**17.** The affidavit also included reference to a utility bill discovered in plain view while the agents awaited arrival of the search warrant. *See* note 11 *supra.*

*Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *Gardner,* 627 F.2d at 909. In carrying that burden, the government must "point to specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion." *United States v. Dugger,* 603 F.2d 97, 99 (9th Cir.1979) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). "The Government does not satisfy [its] burden by leading a court to speculate about what 'may' or 'might' have been the circumstances surrounding the warrantless search." *United States v. Hoffman,* 607 F.2d 280, 284 (9th Cir.1979). *See Dugger,* 603 F.2d at 100 n. 5.

■ The district court in the instant case concluded that there were exigent circumstances that justified the warrantless entry. In so ruling, the court below stated:

> [H]ere there were five men and five automobiles at a house that was away from the beaten path, up by itself. None of these agents knew how many people were there, but with five cars there, they could assume that there were several. The doors were open. If I were one of those agents, I'd jolly well want to know who else is in that house, if anybody, and under the circumstances I think the agents were justified in making sure that there was nobody else in that house that might be disposed to draw a bead on them. *More heinous things have happened to drug agents in the past.*

Our review of the record leads us to conclude that the government clearly failed to carry its burden of demonstrating specific and articulable facts that justify the finding of exigent circumstances.[18]

In *United States v. Basurto,* 497 F.2d 781 (9th Cir.1974), customs agents arrested the defendant in front of his home in connection with a conspiracy to import and distribute marijuana. Following his arrest, Ba-

surto yelled toward the house, "It's the police." We did not find that statement alone sufficient to justify a warrantless search of the house. While it is clear the agents could have inferred from Basurto's comment that there were other occupants in the house, *id.* at 790, neither the comment nor the fact that Basurto had previously possessed a weapon "provided any indication to the agents that there was *anyone* in the house *who might harm them* or that weapons were in the house." *Id.* at 789 (emphasis added).

In *United States v. Flickinger,* 573 F.2d 1349 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), DEA agents entered a house without a warrant to arrest two individuals. The court stated:

> A second type of exigency urged by the government involves risk of danger to the arresting officers or to third persons. Where the crime on which the arrest is based is a crime of violence or the suspect is reasonably believed to be armed, the increased danger to the community and to the arresting officers justifies the avoidance of delay in obtaining a warrant. *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642 [1645–46], 18 L.Ed.2d 782 (1967). However, marijuana smuggling is not necessarily a crime of violence and there was no evidence of violence in this case. In addition, there was no indication that any of the people in the house were in possession of weapons.
>
> . . . .
>
> [W]hen the police do not have a reasonable basis for believing the suspect is armed beyond his alleged participation in non-violent criminal activity, that fact alone is insufficient to demonstrate exigency.

*Id.* at 1355.

When the customs agents in the present case reached the Van Alden residence, they

---

18. We need not decide whether the warrantless entry would have been lawful had the purpose of the officers' entry been to prevent the destruction of evidence. *Compare United States v. Kunkler,* 679 F.2d 187, 191–92 (9th Cir.1982) *with United States v. Basurto,* 497 F.2d 781, 789–90 (9th Cir.1974). It is clear from the

record and the district court's finding that such was not the purpose here. The burden is on the government to establish the justification for invoking the exigent circumstances exception in a particular case. *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970).

were dealing only with a crime of marijuana smuggling. There is nothing in the record which provides the slightest indication that the suspects arrested in the driveway were armed or that there were weapons within the house. Absent some reasonable basis for fearing danger from someone within the house, we find speculative the district court's conclusion that "the agents were justified in making sure that there was nobody else in the house that might be disposed to draw a bead on them." Mere speculation about the circumstances surrounding the warrantless search cannot support a finding of exigent circumstances. *Hoffman,* 607 F.2d at 283–84.

The government's heavy reliance on *Gardner* is misplaced. In that case, DEA agents simultaneously arrested Gardner outside his house and a codefendant inside the house. The floor plan of the house and the complete enclosure of the backyard made it possible for someone to enter the house undetected by the surveillance team stationed outside, and, in fact, a confederate of Gardner's had left the residence unobserved by the surveillance team until he appeared on the street some distance away. Prior to the arrests, an undercover DEA agent had observed weapons within the house. We determined that the known presence of weapons in the house made it reasonable for the agents to conclude that there existed a potential for violence. Given the presence of the weapons and the ability of other suspects to enter the house undetected, we upheld a protective search made to ensure the agents' safety. 627 F.2d at 911–12.

In the present case, the DEA agents made arrests outside the residence. There were no known confederates of the individuals arrested. Before they entered the residence, the agents were able to observe that all of the doors were open and presumably could keep the means of egress under surveillance. Most significantly, the agents knew of no weapons connected with any of the individuals arrested or the residence, nor had they any other articulable basis for a conclusion that a potential for violence existed. Accordingly, *Gardner* provides no

basis for upholding the warrantless search made here.

We acknowledge the desire of narcotics agents to ensure their security. However, as we stated in *Flickinger,*

[w]e are not unsympathetic with the government's premise that "anytime agents seek to effect an arrest or search of a residence, with or without a warrant, the possibility that persons inside might have access to weapons is very real and sometimes critical." Followed to its logical conclusion, however, the government's contention would obviate the necessity for a warrant in any arrest in a residence because every such arrest would involve the potential use of weapons. While we are critically mindful of the need for protection of arresting officers, we cannot accept the full thrust of the government's argument.

573 F.2d at 1355.

We hold that the protective sweep of the residence without a warrant was unlawful.

**B.** *Search Pursuant to Warrant*

Appellants next argue that the evidence seized during the subsequent search of the residence pursuant to warrant must be suppressed because it was tainted by the unlawful protective sweep. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). They rely on *United States v. Allard,* 634 F.2d 1182 (9th Cir.1980) (*Allard II*), and *United States v. Lomas,* 706 F.2d 886 (9th Cir.1983). We find *Allard II* and *Lomas* factually inapplicable. We conclude that *United States v. Allard,* 600 F.2d 1301 (9th Cir.1979) (*Allard I*), does apply and does not require suppression.

*Allard II* and *Lomas* govern the determination of taint where an unlawful entry is followed by a continuing unlawful seizure. *Allard II,* 634 F.2d at 1187; *Lomas,* 706 F.2d at 894. Neither *Allard II* nor *Lomas* applies to the facts at bar because there is no evidence of any continuing unlawful seizure. The unlawful conduct in the present case was confined to the protective sweep

for additional suspects, which lasted only two to three minutes. The agents seized nothing, left the house as soon as the sweep was completed, and reentered only with Spetz after he had elected to go inside the house to await arrival of the search warrant.

To determine whether the illegal entry alone tainted the evidence obtained under the warrant, we turn to *Allard I.* There we concluded that such evidence is not tainted if the government learned of it from an independent source. 600 F.2d at 1305. We also observed that

> "[w]hile the ultimate burden of proof is on the Government to show the absence of taint, the defendant must first establish a factual nexus between the illegality and the challenged evidence. The mere establishment of an illegal search does not place upon the Government the burden of affirmatively proving that each and every piece of evidence is free of taint."

*Id.* at 1305 (quoting *United States v. Choate,* 576 F.2d 165, 186 (9th Cir.) (Hufstedler, J., concurring in part and dissenting in part), *cert. denied,* 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978)).

In the present case, the government relied on some of the observations made during the illegal entry in its affidavit for the search warrant. We conclude that this reliance sufficiently establishes the requisite factual nexus to shift the burden of proof to the government.

The government argued below that there was independent probable cause to support the subsequent search of the house. The district court so held, ruling in the alternative that, even absent the information obtained in the course of the protective sweep,

> there was justification for the issuance of an actual search warrant. The presence of the Ford truck, with the agents knowing that there was a substantial quantity of marijuana in it, backed up to this residence in an out-of-the-way area with the doors open and Mr. Kelley [sic] inside and all these people around ready to start

the movement once Kelley gets the thing opened, it seems to me justification for the belief that that marijuana was to be transported inside the house and that something might well be in the house that would be relevant to the transaction concerned.

The substantial quantity of marijuana and the activity generated when the Ford transporting it arrived at the residence provided probable cause to believe that a search of the house would provide evidence relevant to the transaction.

These events occurred prior to the unlawful protective sweep. The sweep itself was not conducted to obtain information to support a search. Agents were dispatched to procure a search warrant almost immediately following the arrests, which were effected contemporaneously with the sweep. There is no indication in the record that the decision to seek a warrant was predicated on the observations made during the protective sweep. On these facts, and given independent probable cause, we conclude that the independent source rule of *Allard I* is satisfied. Thus, the evidence derived from the subsequent search of the residence pursuant to warrant was not tainted. We hold that the district court properly denied the motion to suppress the evidence obtained pursuant to the search warrant for the Van Alden residence.

## IV.

## VEHICLE FORFEITURES

### A. *The Mercedes*

Appellant Gulino next asserts that the warrantless seizure and search of his automobile and the seizure of the briefcase from the trunk of the automobile were unlawful.

The district court ruled as follows on Gulino's motion to suppress:

> The seizure of the Mercedes-Benz and the search of the Mercedes-Benz I find justified. They certainly knew that the Mercedes-Benz was convoying the Ford. If they didn't know that already, there was a thorough connection between the Ford and the Mercedes when [Gulino]

stopped and took out the briefcase from inside the car and put it in the trunk and then jumped into the Ford.

The agents were justified on that basis in seizing the Mercedes, and I think that they didn't have to leave it on the street there until they could get a search warrant under all the circumstances. Somebody else could have come and picked it up

. . . .

Section 881(a)(4) makes subject to forfeiture "[a]ll conveyances . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of" controlled substances. 21 U.S.C. § 881(a)(4) (1976). Gulino does not argue that the Mercedes was not subject to forfeiture; he simply contends that a warrant was required for the seizure.

Section 881(b)(4) requires that property subject to forfeiture be seized pursuant to a warrant unless "the Attorney General has probable cause to believe that the property has been used or is intended to be used in violation of this subchapter." [19] Other circuits have considered the proper construc-

tion of the warrant provision of section 881(b)(4), with differing results. On the one hand, the Third Circuit has concluded that a literal reading of the subsection permits a warrantless seizure on probable cause alone, notwithstanding the absence of exigent circumstances, and that such an interpretation comports with the requirements of the fourth amendment. *United States v. Bush,* 647 F.2d 357, 368–69 (3d Cir.1981). On the other hand, the First Circuit has construed the probable cause exception of the subsection as "justifying the warrantless seizure of an automobile only when the seizure immediately follows the occurrence that gives the federal agents probable cause to believe that the automobile is subject to forfeiture under section 881(a) *and* the exigencies of the surrounding circumstances make the requirement of obtaining process unreasonable or unnecessary." *United States v. Pappas,* 613 F.2d 324, 330 (1st Cir.1979) (emphasis in original).

We have previously considered the application of the fourth amendment to a similar forfeiture statute, 49 U.S.C. § 782.[20] *United States v. McCormick,* 502 F.2d 281 (9th Cir.1974). There we held that, although

**19.** 21 U.S.C. § 881(a)–(b) (1976) provides in pertinent part:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.
. . . .
(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) . . . .
. . . .
(b) Any property subject to forfeiture to the United States under this subchapter may be seized by the Attorney General upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims by any district court of the United States having jurisdiction over the property, except that seizure without such process may be made when—
. . . .
(4) the Attorney General has probable cause to believe that the property has been

used or is intended to be used in violation of this subchapter.

**20.** 49 U.S.C. § 782 (1976) provides in pertinent part:

Any vessel, vehicle, or aircraft which has been or is being used in violation of any provision of section 781 of this title, or in, upon, or by means of which any violation of said section has taken or is taking place, shall be seized and forfeited . . . .
49 U.S.C. § 781 (1976) provides in part:
(a) It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any vessel, vehicle, or aircraft, or upon the person of anyone in or upon any vessel, vehicle, or aircraft; or (3) to use any vessel, vehicle, or aircraft to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article.
(b) As used in this section, the term "contraband article" means—
(1) Any narcotic drug which has been or is possessed with intent to sell or offer for sale in violation of any laws or regulations of the

authorized by an act of Congress, a forfeiture seizure must nevertheless comport with the requirements of the fourth amendment, because " 'no Act of Congress can authorize a violation of the Constitution.' " *Id.* at 286 (quoting *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973)). In *McCormick,* we began with the "basic constitutional rule" that searches and seizures conducted without a warrant are *per se* unreasonable, subject to a limited number of exceptions.[21] *Id.* at 285. We concluded that that rule is applicable to forfeiture seizures under section 782.[22] The reasoning and principles employed in *McCormick* apply no less to a forfeiture seizure made pursuant to section 881 than to one made pursuant to the forfeiture statute there at issue.[23] Accordingly, we hold that *McCormick* applies to seizures made pursuant to section 881.[24]

The government acknowledges that *McCormick* is applicable to section 881 forfeitures but argues that the seizure of the Mercedes falls within the automobile exception to the warrant requirement because of exigent circumstances that made it impracticable to obtain a warrant.[25] The government relies on the DEA agents' lack of prior knowledge as to the Mercedes and the fact that the vehicle was parked on a public street where it could easily have been removed by a cohort of Gulino. We do not agree that the automobile exception is applicable.

The automobile exception to the warrant requirement of the fourth amendment had its genesis in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The exception is predicated on the longstanding distinction

> between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id.* 267 U.S. at 153, 45 S.Ct. at 285.

The Supreme Court recently restated the rationale underlying the automobile exception:

---

> United States dealing therewith; or which has been acquired or is possessed, sold, transferred, or offered for sale, in violation of any laws of the United States dealing therewith
> . . . .

**21.** The exceptions considered in *McCormick* were search incident to arrest, the automobile exception, and the plain view exception. 502 F.2d at 286–87.

**22.** In *McCormick* we found the automobile exception inapplicable to the seizure of the vehicle there involved because of the absence of "exigent circumstances." *Id.* at 287.

**23.** If there is any distinction to be drawn between 49 U.S.C. § 782 and 21 U.S.C. § 881 in respect to warrant requirements, section 881, which contains a warrant provision, should be more strictly construed than section 782, which simply provides that property subject to forfeiture "shall be seized." *United States v. Pappas,* 613 F.2d 324, 328 n. 8 (1st Cir.1979).

**24.** We have on several occasions upheld searches of vehicles seized under section 881. *United States v. Stewart,* 650 F.2d 178 (9th Cir.1981); *United States v. Stewart,* 595 F.2d

500 (9th Cir.1979); *United States v. Johnson,* 572 F.2d 227 (9th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978). None of these decisions, however, precludes us from considering the constitutional constraints on a seizure under that section. In each of them, the legality of the seizure under section 881 was assumed.

In *United States v. Kimak,* 624 F.2d 903 (9th Cir.1980) (per curiam), we also upheld the seizure of a vehicle under section 881. We concluded that the seizure fell within the automobile exception to the fourth amendment warrant requirement announced in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *Kimak,* 624 F.2d at 905. We assumed without discussion that *McCormick* applied to a section 881 seizure. *Id.*

**25.** In its motion for modification, the government argues, in essence, that the plain view exception to the warrant requirement applies to the forfeiture seizure of the Mercedes. Although we indicated the availability of the plain view exception in *McCormick,* the government did not raise this argument on appeal nor did it cite any of the case law on which it currently seeks to rely. We will not consider the argument for the first time at this juncture.

Thus, since its early days Congress had recognized the impracticability of securing a warrant in cases involving the transportation of contraband goods. It is this impracticability, viewed in historical perspective, that provided the basis for the *Carroll* decision. Given the nature of an automobile in transit, the Court recognized that an immediate intrusion is necessary if police officers are to secure the illicit substance. In this class of cases, the Court held that a warrantless search of an automobile is not unreasonable. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 2163, 72 L.Ed.2d 572 (1982) (footnotes omitted).

Although automobiles are inherently mobile, "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. at 461–62, 91 S.Ct. at 2035–36. The existence of probable cause standing alone is not sufficient to justify a warrantless search or seizure of an automobile. A warrantless search or seizure is permissible only if probable cause exists *and* the facts or circumstances surrounding the particular search of an automobile are sufficient to bring that search within the automobile exception. It is an understatement to observe that the contours of the automobile exception are not clearly defined.[26] In fact, we have previously noted the impossibility of reconciling the Supreme Court's decisions in this area. *United States v. McClain*, 531 F.2d 431, 433 (9th Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

Despite the continuing confusion, *Ross* helps us to identify the two principal underpinnings of the automobile exception. The first relates to the mobility of the particular vehicle. The second relates to the ease with which contraband may be removed from an automobile. The automobile exception is most frequently found applicable when two factors are present:

when a moving vehicle is stopped and when there is probable cause to believe that a vehicle contains contraband. *See Ross*, 102 S.Ct. at 2163–64; *Carroll*, 267 U.S. at 153–54, 45 S.Ct. at 285–86. Thus, when officers stop a vehicle "in transit" and have probable cause to believe that it contains contraband, the automobile exception will validate a warrantless search or seizure.

The case before us is at the opposite end of the automobile exception spectrum. Neither of the two key factors is present here. While the DEA agents had probable cause to believe that the Mercedes had been used to facilitate the transportation of contraband, they had no reason to believe that the Mercedes contained contraband. Further, the agents seized the automobile from a public street on which its owner had parked it. The car was two miles from the residence at which its owner was arrested prior to the seizure. Finally, there were no other "exigent circumstances" present.

We have previously said that warrantless seizures of parked vehicles are not justified under the automobile exception

> if founded merely on a generalized fear that an unknown person will move the vehicle or destroy evidence in it; but where the police have and can articulate specific grounds for believing that a known accomplice, acquaintance, or, in unusual cases such as *United States v. Cohn*, [472 F.2d 290 (9th Cir.1973)] an unknown person passing by is likely to move the vehicle or destroy evidence within it before a warrant could be secured, a warrantless probable-cause search is permissible. Under *Chambers* [*v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)], the police are not required to post a guard around the car in such circumstances.

*United States v. Connolly*, 479 F.2d 930, 935 (9th Cir.), *cert. dismissed*, 414 U.S. 897, 94 S.Ct. 248, 38 L.Ed.2d 139 (1973). In *Connolly*, we upheld the warrantless search of a

---

**26.** Although "general principles are easily stated, the decisions of this Court dealing with the constitutionality of warrantless searches, especially when those searches are of vehicles, suggest that this branch of the law is something less than a seamless web." *Cady v. Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973) (Rehnquist, J.).

vehicle parked on a public street, after finding exigent circumstances. There, the officers had probable cause to believe the vehicle contained narcotics and "specific reason to believe that someone who might move the car or take the contraband was awaiting Connolly's return." *Id.* Shortly before his arrest, Connolly was heard to tell an individual in his house that he would return in about twenty minutes. The agents unsuccessfully attempted to follow this person. Because there was a reasonable fear that a known person would attempt to contact Connolly momentarily, we concluded that the agents were justified in searching the vehicle immediately, without first obtaining a warrant.

In *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Blackmun, J.), the Supreme Court, by a five to four vote, upheld the warrantless seizure of a parked car that the officers believed would reveal evidence of a crime, although no contraband was involved. Four justices signed an opinion upholding the seizure in which they noted, based on specific facts, that the officers had reason to believe that the defendant's family might attempt to move the vehicle if it were not seized. *Id.* at 595, 94 S.Ct. at 2471.[27] One justice voted to affirm on a ground that did not require him to express any view on the warrantless seizure issue. *Id.* at 596, 94 S.Ct. at 2472 (Powell, J., concurring) (defendant had a

"full and fair opportunity to litigate [the issue] in the state courts"). The four dissenting justices found no exigent circumstances that justified a warrantless seizure of the parked vehicle. *Id.* at 598–99, 94 S.Ct. at 2473–74 (Stewart, J., dissenting).

 We are reluctant to attempt to derive any general rule as to parked cars from *Cardwell.* If we are to abandon the view expressed in *Connolly,* we would require a far clearer directive from the Supreme Court. Thus, we reaffirm our understanding that a warrantless seizure of a parked car is lawful under the automobile exception only where specific exigent circumstances justify an immediate seizure.[28]

 In the present case, the DEA agents were aware of only one driver of the vehicle, Gulino, who had stated that he owned the vehicle, and from whom the agents had secured the keys. It is true that at the time the vehicle was seized for forfeiture, the agents did not know how many persons were involved in the activities under surveillance. However, in the absence of specific, articulable grounds for believing that the Mercedes might be moved by an individual not already under arrest, the agents' lack of knowledge in this regard is only a "generalized fear that an unknown person [would] move the vehicle." *Connolly,* 479 F.2d at 935.[29] Moreover, there was

---

**27.** The four Justices also noted that the search involved a lesser fourth amendment intrusion than ordinarily occurs, since the officers only sought to obtain evidence from the exterior of the car. 417 U.S. at 591–92, 94 S.Ct. at 2469–70.

**28.** In *McCormick,* we said that *Carroll* "authorizes warrantless seizures of automobiles when two factors are present . . . probable cause to believe that the automobile contains contraband, and . . . exigent circumstances associated with the automobile." 502 F.2d at 287.

In *Kimak,* we distinguished the *McCormick* facts. *Kimak's* automobile was still being used in connection with the narcotics transaction at the time it was seized. Kimak had stepped out of his car momentarily and was crossing the street to make a telephone call when he was arrested. We cited with approval the portion of *McCormick* that contains the two part requirement set forth above. 624 F.2d at 905.

Thus, the *McCormick* "exigent circumstances" rule remains the law of the circuit. Moreover, in *Kimak* we did not express or suggest any disagreement with *Connolly.* Rather, we based our decision on the facts that Kimak had only left his car momentarily, the car was still in the process of being used to conduct a narcotics sale that had not been completed, and the arrest and seizure occurred contemporaneously. *Id.*

**29.** The government's reliance on *United States v. Hickman,* 523 F.2d 323 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976), is misplaced. In that case, the agents did not know how many persons were involved in the suspected smuggling activities, but they were in possession of facts that supported a reasonable conclusion that other members of the conspiracy might move the boat to be searched. There, two boats with identical registration numbers had been towed

no cause to believe there was any contraband in the car, let alone that someone might remove it.[30]

We hold that the warrantless forfeiture seizure of the Mercedes was not justified under the automobile exception.[31] Thus, the subsequent search which produced the briefcase was unlawful, and the evidence retrieved from the briefcase should have been suppressed. *McCormick*, 502 F.2d at 288. However, we also hold that the district court's failure to suppress that evidence does not require reversal of Gulino's conviction.

Gulino was convicted on one count of conspiracy to distribute and to possess with intent to distribute marijuana and one count of possession with intent to distribute marijuana. He does not suggest in what respect, if any, the failure to suppress the evidence seized from the briefcase affected his conviction. We conclude that it did not.

▬▬▬ Violation of the fourth amendment exclusionary rule is constitutional error. *United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir.1977) (citing *United States v. Barclift*, 514 F.2d 1073, 1075 (9th Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 63 (1975)). In order to find federal constitutional error harmless, it must be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

"[T]he *Chapman* rule does not require an appellate court to reverse unless there is a *reasonable possibility* that the error materially affected the verdict." *Valle-Valdez*, 554 F.2d at 915 (emphasis in original).

Gulino was tried before the district judge on the basis of the transcript of the suppression proceedings and additional stipulated facts and testimony. There was no dispute regarding the material facts introduced by the government to establish his guilt. No credibility questions were presented. The facts (excluding the evidence found in the briefcase) are as follows: Gulino was present at the Matson terminal when Kelly picked up the van pak of marijuana. Gulino and Kelly left the terminal in separate vehicles but stopped and spoke together en route to the Van Alden residence. Gulino escorted the truck containing the marijuana to a location near its destination and rode in it for the last two miles of the trip. He was arrested in the driveway with several other persons who were standing around the van pak which had not yet been removed from the truck. Near the garage there was an empty crate from which the odor of marijuana emanated. Telephone records were introduced showing numerous calls from Gulino to the Van Alden residence. The residence itself contained marijuana, scales, and other paraphernalia, including duct tape similar to

---

on a boat trailer registered to a third person not yet under arrest. We concluded that "the agents could not discount the possibility that the registered owner of the boat trailer was actively involved...." *Id.* at 329. In contrast, the government in the present case can rely only on the agents' lack of knowledge as to the number of persons involved in the conspiracy. They can offer no specific, articulable facts that would lead them to suspect that there were additional persons involved. More is required to rise above the generalized fear deemed insufficient to support a warrantless search in *Connolly*.

**30.** *Cf. United States v. Cohn*, 472 F.2d 290 (9th Cir.1973). In *Cohn*, we placed some significance on the fact that the automobile searched without a warrant was parked on a public street. *Id.* at 292. There, however, the automobile had been driven to the residence of a known marijuana trafficker shortly before the search, by an individual other than the one who was arrested while driving it, and the automobile was registered in the name of the mother of a third person also under surveillance. We concluded, therefore, that the vehicle "was subject to being moved again without warning and driven outside the jurisdiction." In addition, a strong odor of marijuana was detectible through a partially open window of the vehicle, and there was a quantity of marijuana in plain view.

**31.** The district court's reasoning in effect was that where probable cause for seizing or searching a parked car exists, a warrant is not required. As we have explained, that is an erroneous interpretation of the law of this circuit. Although, in upholding the seizure, the district court included the phrase "under all the circumstances," it pointed to no specific or articulable circumstances justifying an immediate seizure, and we find none in the record.

that used to seal the plastic bags of marijuana in the van pak.

No facts were adduced which would suggest an explanation for Gulino's conduct other than that he was a participant in the marijuana transaction. We believe that a district judge, presented with the undisputed evidence described above, would have been compelled to conclude that Gulino's guilt on the charges of which he was convicted was established beyond a reasonable doubt. In view of the fact that the case was tried before the court on essentially undisputed facts, we conclude that there is no reasonable possibility that the error materially affected the verdict.

### B. *The Datsun Pickup Truck*

■ Spetz argues that the district court erred in failing to suppress the marijuana seized during the warrantless search of the Datsun truck. Spetz asserts that the agents lacked probable cause to justify a forfeiture seizure, that even if probable cause existed the search preceded the seizure, and that there were no exigent circumstances which justified seizure or search of the vehicle without a warrant.

Within half an hour after the Ford truck transporting the van pak reached the Van Alden residence, the DEA agents observed Spetz arrive in a Datsun truck. The Datsun was equipped with a camper. As one of the agents descended in the helicopter, he saw Spetz run toward the Datsun, enter it and drive rapidly away. Other agents stopped the truck, removed Spetz from it and arrested him. They observed an empty crate near the place Spetz' Datsun had been parked. The crate bore the same name and address as the van pak and emitted an odor of marijuana.

The Datsun camper was loaded. An agent observed a plastic tarpaulin covering the bed of the truck. The twelve to fifteen inch bulges in the tarpaulin indicated that there were bulky objects underneath.

After execution of the search warrant for the Van Alden house, an agent inquired whether Spetz was the registered owner of the Datsun, informed him that the vehicle was being forfeited, and obtained the keys from him.

The district court ruled as follows on Spetz' motion to suppress below:

I'm going to find that the search of the Datsun was justified. The Datsun was near that empty crate marked in the same manner as was the van pak, to somebody's name. Was it Murray? It was empty, and it smelled of marijuana. The circumstances under which Mr. Spetz was leaving added to the suspicion. The fact that there was something underneath that tarpaulin that could well have been marijuana added to the suspicion. I think the agents were justified in seizing the Datsun and therefore in making an inventory search during the course of which they found the material.

#### 1. *Probable Cause*

Spetz first argues that there was no probable cause to believe that his truck was subject to forfeiture under section 881. If agents have probable cause to believe that a vehicle is being used to carry or transport contraband, it is subject to forfeiture under the federal forfeiture statutes. *United States v. Johnson,* 572 F.2d 227, 234 (9th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978); *United States v. Capra,* 501 F.2d 267, 280 n. 11 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).[32]

Like the Ford truck, the Datsun truck was the type of vehicle that could be used to transport substantial quantities of contraband. Of course, the nature of the vehicle alone does not provide probable cause to

32. Spetz argues that the Datsun was not subject to forfeiture under section 881 because, even if there was cause to believe it contained marijuana, that marijuana had not "been manufactured, distributed, dispensed or acquired" within the meaning of section 881(a)(1). We

find his argument without merit. In any event, the vehicle was also subject to forfeiture under 49 U.S.C. § 782, and none of Spetz' arguments suggest any reason why that section would be inapplicable.

believe that it contains contraband. However, the fact that the truck was suitable for transporting large amounts of marijuana, its proximity to the empty crate which had recently contained marijuana, the bulging tarpaulin that might reasonably be used to conceal marijuana, and Spetz' flight, combined to provide probable cause to believe that the Datsun truck was transporting contraband when it was stopped, and was therefore subject to forfeiture.

## 2. The Seizure

■ Spetz next complains that the truck was searched prior to seizure. Accordingly, Spetz asserts that the search was not conducted pursuant to forfeiture. He contends that both seizure and search occurred approximately nine hours after the arrests were made. Because the agents had time to secure a warrant for the search of the residence, Spetz argues, they could and should have done so for the truck as well.

We are unable to agree with his initial premise. There is a conflict in the record with respect to whether the agent announced the forfeiture before or after the keys were obtained and the Datsun searched. However, the fact of seizure does not depend on when the forfeiture decision was announced to Spetz.[33]

The agents stopped the truck in the driveway of the residence and it remained there. Probable cause for forfeiture arose shortly after the arrests.[34] There were at least five DEA agents on the premises at all times until the activities there were completed. The Mercedes, which had been seized for forfeiture not long after the arrests, was moved to the driveway and parked there for safekeeping. The Datsun truck was, for all practical purposes, under the same degree of control as the Mercedes automobile. Certainly, no one would have been permitted to remove either vehicle from the custody of the agents. We conclude that the Datsun truck was effectively seized for forfeiture at or about the time that probable cause arose therefor.

The question remains whether the forfeiture seizure was lawful without a warrant. We conclude that the automobile exception applies.

Here, the two key elements that underlie the automobile exception were present. There was probable cause to believe that the Datsun truck contained contraband and the vehicle was stopped while "in transit." *Ross,* 102 S.Ct. at 2163–64. In *Carroll* and *Ross,* the vehicles were stopped while travelling on a public road. Here, Spetz was fleeing the scene of a narcotics transaction in his truck, but the vehicle had not yet reached the public street when it was stopped. We perceive no difference between the mobility of the truck and the mobility of the vehicles in *Carroll* and *Ross.* We believe that the fact that the fleeing vehicle had not yet reached the public highway is not determinative. Where there is probable cause to believe that a vehicle contains contraband, and the vehicle is stopped in flight, the automobile exception applies.

Spetz argues that the present case is indistinguishable from *United States v. Pruett,* 551 F.2d 1365 (5th Cir.1977), in which the Fifth Circuit found unlawful a warrantless search of an automobile parked at a residence. The court concluded that the agents had probable cause to believe that the vehicle had been used to transport cocaine, but no cause to believe that, at the time of the search, the automobile was being used for an illegal purpose. That distinction was found to be determinative under *Coolidge.* In the present case, unlike *Pruett,* there was probable cause to believe that the vehicle contained contraband at the time of the seizure and search.

**33.** The forfeiture announcement regarding the Mercedes was made earlier. However, the agents made that announcement in order to obtain the keys from Gulino so that they could bring the car to the Van Alden property where Spetz' truck already was located.

**34.** The record provides no indication of any occurrence subsequent to the discovery of the empty crate of marijuana that would have caused the agents to decide to seize the Datsun.

Since the warrantless forfeiture seizure of the Datsun truck was valid, the subsequent search was lawful. This rule "rests on the premise that government agents, having obtained possession by a lawful seizure under the forfeiture statutes, may search a vehicle at will." *Johnson,* 572 F.2d at 233 (search two weeks after seizure); *United States v. Karp,* 508 F.2d 1122, 1124 (9th Cir.1974), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975); *McCormick,* 502 F.2d at 284. *See also Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

## V.

### FORTUNE FAVORS THE BRAVE

Kalik argues that the trial court erred in admitting into evidence a book entitled *Fortune Favors the Brave.* He contends that the book was admitted into evidence without a proper foundation, in violation of Fed.R.Evid. 901, that it was irrelevant, and that it was not introduced as proper impeachment of a prior inconsistent statement by Kalik's father.

### A. *Foundation*

■ Kalik contends that the government did not prove that he had written the book. Rule 901 requires that evidence be authenticated or identified prior to admission. Authentication or identification "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901. The question of the sufficiency of the authentication of a document rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Arena v. United States,* 226 F.2d 227, 235 (9th Cir.1955), *cert. denied,* 350 U.S. 954, 76 S.Ct. 342, 100 L.Ed. 830 (1956).

■ The government introduced the book at issue in the course of its cross

examination of appellant's father, Horace Kalik. In response to a question, Horace testified that he had read or looked through a book by his son. The book *Fortune Favors the Brave* was then placed before him. He acknowledged that he had previously begun to read the book placed before him. He testified further that the front page of the book stated that it was written and copyrighted by Max Andrew Kalik, his son. He also testified that he had discussed the book with his son, specifically in connection with having the book made into a film.

On these facts, we cannot conclude that the trial court abused its discretion in determining that the book was properly authenticated for purposes of Rule 901.

### B. *Relevance*

■ Kalik next claims that the book was not relevant under Fed.R.Evid. 401. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* On appeal, we may reverse the trial court's determination that evidence is relevant and admissible only for a clear abuse of discretion. *United States v. Cox,* 633 F.2d 871, 874 (9th Cir.1980), *cert. denied,* 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981).

■ On cross-examination, Horace Kalik denied stating, in the course of a telephone call to the Van Alden residence on the day of the arrests, that he "would not be surprised if [his son] had been arrested for drug dealing." On further questioning, the senior Kalik explained that he would not have so stated because he had no "inkling or knowledge" that his son knew anything about dealing. At this point, the government asked him to identify *Fortune Favors the Brave,* which describes drug dealing,[35] and questioned him regarding his knowledge of its contents.

---

**35.** In the course of cross-examination, the government asserted that the book was "all about drug dealing." Horace Kalik stated that he thought the book was about "international

skiing." Although the district judge had not examined the book at that point, he later stated that "at least in the first section every few pages they talk about pot transactions."

We cannot say that the book was irrelevant. Since Horace Kalik admitted some substantial familiarity with the general nature of the book, it was relevant to impeach his statement that he had no inkling that his son knew about drug dealing.[36]

Kalik contends that even if relevant, under Fed.R.Evid. 105 the book should have been admitted only for the limited purpose of impeachment and should not have been considered in determining guilt or innocence. However, no request that the evidence be so limited was made as required by Rule 105. We note that Kalik's defense at trial was that he was simply present at the house on Van Alden on the day of the arrests, but was not a participant in nor aware of the marijuana transaction. In light of Kalik's explanation of his presence at the scene of the drug transaction, we cannot say that the district court abused its discretion in stating that Kalik's prior familiarity with drug dealing, though gained as an author, was of some relevance.[37]

## VI.

### SUFFICIENCY OF THE EVIDENCE—KALIK

Kalik argues that the evidence against him shows only that he was a co-lessee of the Van Alden house and that he was present on the day the contraband arrived. We agree with the district court that the evidence shows much more.[38]

In reviewing the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the government and determine whether there was sufficient relevant evidence on which the district court could have found Kalik guilty beyond a reasonable doubt. *United States v. Price,* 623 F.2d 587, 591 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). We must also draw all reasonable inferences from the evidence in favor of the government. *United States v. Jabara,* 618 F.2d 1319, 1328 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980).

Kalik was convicted on one count each of conspiracy to distribute and to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, and of aiding and abetting the conspiracy, in violation of 18 U.S.C. § 2.

Conviction on the conspiracy count required evidence sufficient to show that a conspiracy existed, that Kalik was connected with it and that he knew of his connection. *United States v. Zemek,* 634 F.2d 1159, 1170–71 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341, 450 U.S. 985, 101 S.Ct. 1525, 67 L.Ed.2d 821, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). Kalik does not contend that there was no conspiracy. He simply argues that he was not a participant in the activities at the Van Alden residence.

**36.** Kalik contends that *Fortune Favors the Brave* was introduced to impeach his father's denial that he said he would not be surprised if his son had been arrested for drug dealing. We think the record fairly supports the government's contention that the book was used to impeach his explanation of the denial, that he would not have so stated because he had no inkling that his son knew about drug dealing. Accordingly, we do not address Kalik's argument that it was necessary to introduce proof of the statement alleged to have been made in the telephone conversation before it could be impeached.

**37.** Moreover, although the district court noted Kalik's authorship of the book in determining his guilt, the court's reliance on that fact was minimal. The court referred to the book as showing Kalik's "orientation with respect to marijuana." Nonetheless, the court stated "I

can't find him guilty on that basis, but certainly marijuana transactions are not remote from his orientation, and I think that has *some* significance." The court also carefully summarized the other evidence against Kalik, and stated quite forcefully that on the basis of that evidence he had no doubt whatever about Kalik's guilt. In ruling that the book was admissible, the district court stated, "I am going to receive it for whatever it is worth. . . . It is not going to carry the day one way or the other, however."

**38.** In view of our conclusion that the material seized from Gulino's briefcase must be suppressed, we do not consider that evidence in evaluating the sufficiency of the evidence to support Kalik's conviction. We note that in its oral ruling on Kalik's conviction, the district court did not refer to or rely on the evidence seized from the briefcase.

If a conspiracy exists, "evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict [the defendant] with knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir.1977) (emphasis in original).

"In order to aid and abet another to commit a crime, it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seeks by his action to make it succeed.'" *United States v. Batimana,* 623 F.2d 1366, 1369–70 (9th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.)). "Even though a conspiracy may exist, independent proof may justify a charge on aiding and abetting." *Id.* at 1370 (citing *Nye & Nissen v. United States,* 336 U.S. 613, 619–20, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949)).

Kalik was a co-lessee of the Van Alden residence and paid the rent. His possessions, including clothes, were there. It was reasonable to conclude, as did the district court, that the house was his home. Kalik was in the driveway when the arrests occurred. At that time, the Ford, carrying the van pak, was backed up to the garage. Kelly was standing in the back of the truck with a prybar. There was sufficient evidence to conclude that Kalik and the others were preparing to unload the marijuana van pak at the time of their arrests.

There was evidence of numerous telephone calls from Gulino to the residence. In addition, the narcotics and narcotics paraphernalia found in plain view in the house lead to two proper inferences drawn by the district court: first, that the marijuana transaction was an ongoing activity, and second, that it would not have been possible for Kalik to be unaware that the activity was occurring. The evidence supports the further conclusion that Kalik willingly and knowingly furnished the residence for the transaction.

In short, there was sufficient evidence to show both Kalik's connection with the conspiracy and his knowledge, association, and willing participation in the marijuana transaction at the house he leased. *See United States v. Oropeza,* 564 F.2d 316, 321 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

For the reasons discussed above, the conviction of each of the appellants is AFFIRMED.